627 A.2d 555

**Robert Louis OATES, III**

v.

**STATE of Maryland.**

**No. 1805, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

July 13, 1993.

Brian J. Murphy, Assigned Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. Baltimore, and Alexander Williams, Jr., State's Atty. for Prince George's County, Upper Marlboro, on the brief), for appellee.

Argued before WILNER, C.J., and MOYLAN and BISHOP, JJ.

MOYLAN, Judge.

The single question raised by this appeal is simple: When two defendants are jointly convicted of perpetrating a criminal homicide, must their levels of guilt (blameworthiness) be the same? The answer is equally simple: No.

The appellant, Robert Louis Oates, III, was convicted by a Prince George's County jury presided over by Judge James Magruder Rea, of manslaughter. His codefendant, Roderick Giles, was convicted of second-degree murder. On this appeal, the appellant raises the two closely related contentions:

1. that Judge Rea erroneously allowed the inconsistent verdicts involving the appellant and his codefendant to stand; and

2. that Judge Rea erroneously instructed the jury that if it found Giles guilty of a crime it could find the appellant guilty of aiding and abetting a lesser crime.

The trial lasted seven days, in the course of which twenty-five witnesses testified. Through that testimonial kaleidoscope, a general pattern emerged with modest clarity. On April 14, 1990, a birthday celebration was held at the Classics III Restaurant on Allentown Road in Prince George's County. Neither the appellant nor the codefendant were participants in that celebration but they were present at the restaurant. In the course of the evening, a fight broke out between the appellant and the codefendant, on the one hand, and various party guests, on the other hand. Although a precise chronology is difficult to establish, the level of turbulence was clear. As one party guest testified, a fight started and "people started screaming. Furniture flying in the air. It was very loud. Smashing glass."

During the first phase of hostilities, still within the restaurant, one of the party guests and the ultimate homicide victim, Patrick Stanford, was involved in a fight with both the appellant and the codefendant, Giles. One of the latter two punched Stanford in the mouth, knocking out four teeth. The appellant and Giles then moved on to other fights with other party guests. At some time between 1:30 and 2 A.M., the appellant and Giles left the restaurant and were on the parking lot at the same time that various party guests, including the ultimate homicide victim, Patrick Stanford, were leaving. Threats were hurled between the two opposing camps. One of the departing party guests described how Giles grabbed from his car and then waved menacingly at that witness an object resembling a "butterfly knife."

Patrick Stanford drove away from the scene in a station wagon with two female companions. The appellant and Giles left the scene in Giles's white Jetta. Shortly thereafter, at the intersection of Allentown Road and Branch Avenue, the station wagon was stopped for a traffic light when the Jetta pulled up behind it. The appellant and Giles got out of the Jetta and, with a crowbar, smashed the windows of the station wagon. Stanford was pulled out of the wagon and both assailants proceeded to punch and kick him.

In terms of the final lethal attack on Stanford, Pattina Avery, in whose honor, incidentally, the birthday party had been held, testified that both assailants were "punching and stabbing" Stanford at the same time. An uninvolved witness, a University of Maryland student who was simply driving in the area, testified that one of the assailants was holding the victim while the other was hitting him. After the victim fell to the ground, the two attackers proceeded to kick him. The medical examiner testified that Stanford's body revealed facial injuries, broken teeth, and twelve stab wounds. The cause of death was the multiple stab wounds.

Both Giles and the appellant elected to testify and admitted their participation in the final altercation with Patrick Stanford at the traffic light. After giving his version of the earlier

brawl at the Classics III Restaurant, Giles testified that as he and the appellant were driving from the scene, they spotted the car in which Stanford was riding. Giles handed the appellant a crowbar and the appellant jumped out and "began busting out the windows of the car." As the two female passengers ran screaming from the scene, Stanford got out of the car and allegedly attacked Giles with a knife. According to Giles, he and the appellant overpowered Stanford and took the knife away. Giles then described how he began "throwing punches" at Stanford with the knife in his hand but denied any actual stabbing. He testified that the appellant was also punching Stanford, although without a knife. Giles was later shocked to learn that the victim had been stabbed.

In his testimony, the appellant also described the fight at the Classics III Restaurant which, he stated, resulted in a "stampede." The appellant acknowledged getting out of the car at the traffic light and smashing out the back window of the car in which Stanford was riding. The appellant further testified that it was his intention only to break the window and then leave. He was surprised when Giles began fighting with the victim and he, the appellant, tried to pull Giles off the victim. He disclaimed any intention of hurting anyone that evening.

What the jury concluded and the evidence supported was clear. The death of Patrick Stanford was a criminal homicide. Both the appellant and Giles jointly participated in that criminal homicide. On the basis of the "butterfly knife" earlier observed in Giles's possession and on the basis of Giles's acknowledgement that a knife was in his hand as he repeatedly threw punches at Stanford, the jury obviously concluded that Giles was a principal in the first degree, the wielder of the weapon that struck the fatal blows. From the multiplicity of potentially fatal blows, moreover, the jury concluded that Giles attacked Stanford with a specific intent to kill. The jury gave Giles the benefit of the doubt, however, when it concluded that that specific intent to kill was not premeditated. The obvious verdict under the circumstances was that Giles was guilty of murder in the second degree.

It is equally clear that the jury concluded, with abundant support in the evidence, that the appellant jointly participated with Giles in the criminal homicide. The jury obviously concluded that the appellant was a principal in the second degree, not wielding the lethal weapon but actively aiding and abetting the man who did. Perhaps crediting the exculpatory testimony of the appellant or at least entertaining some doubt thereby, the jury did not conclude that the appellant attacked Stanford with a specific intent to kill or even a specific intent to do grievous bodily harm. Giving the appellant a significant benefit of the doubt, it concluded simply that the appellant was guilty of either 1) grossly negligent, life-endangering conduct toward Stanford or 2) the perpetration of an unlawful act (assault and battery) upon Stanford that resulted in Stanford's death. Either of those closely related states of mind would render the appellant guilty of involuntary manslaughter. That was the verdict the jury returned as to the appellant.

Judge Rea gave an excellent instruction on each of these forms of involuntary manslaughter, a verdict on either of which theory was fully supported by the evidence in this case:

"Now, we're going to get down to involuntary manslaughter. And I'm going to talk about two kinds of involuntary manslaughter. One is involuntary manslaughter involving [a] grossly negligent act, and the other is involuntary manslaughter where a homicide occurs during an unlawful act. This is a lesser included offense of murder, ladies and gentlemen.

The defendant is charged with the crime of involuntary manslaughter. In order to convict the defendant of involuntary manslaughter, the State must prove that the conduct of the defendants caused the death of Patrick Stanford and that the defendant or defendants, conscious of the risk, acted in a grossly negligent manner; that is, in a manner that created a high degree of risk to human life.

Now, [in] the other type of involuntary manslaughter, the State must prove, in order to convict, that the defendant or defendants either singly or with another ... attempted to commit or did commit an unlawful act.

Now, the Court can look at it from this standpoint ... an unlawful act would have been the intent to commit assault and battery, which is a misdemeanor in the State of Maryland. And that the defendant, [alone] or with another, participated in the crime of killing the victim Patrick Stanford, and that the act resulting in the death of Patrick Stanford occurred during the commission or attempted commission of the unlawful act."

■ The appellant now claims that his verdict and Giles's verdict were "legally inconsistent" and that his verdict of "aiding and abetting the crime of grossly negligent involuntary manslaughter" should not, therefore, have been accepted by Judge Rea. How, he asks, can he have aided and abetted in a manslaughter when the person so aided and abetted was found guilty not of manslaughter but of second-degree murder?

The appellant betrays a lack of appreciation of the complex matrix of blameworthiness arising out of a single criminal homicide. The appellant was not in this case an aider and abettor to involuntary manslaughter any more than he was an aider and abettor to second-degree murder or an aider and abettor to first-degree murder. He was, purely and simply, an aider and abettor to criminal homicide, that and nothing more. When two or more persons are joint participants in a crime, they are joint participants only with respect to a single and common *actus reus.* Where, however, a single criminal act has different levels of blameworthiness contingent upon the particular *mens rea* with which it is perpetrated, multiple participants in that crime do not necessarily share the same *mens rea.* Although joint participation ultimately depends upon a mutual tie to the same criminal act, the individual *mentes reae* or levels of guilt of the joint participants are permitted to float free and are not tied to each other in any way. If their *mentes reae* are different, their independent levels of guilt, reflected by nondependent verdicts, will necessarily be different as well.

The classic definition of a crime is the coming together of a guilty act and a guilty mind, an *actus reas* and a *mens rea.* With the vast majority of crimes, there is a single guilty act and a single guilty mind. With criminal homicide as it has evolved over the centuries, however, there is a single guilty

act but a rich smorgasbord of guilty minds from which to choose. Picture, for a moment, a body on the floor with a bullet hole between its eyes. Picture the homicidal agent standing over it with smoking gun in hand. We have a homicide (the killing of one human being by another) and we have a homicidal agent, but do we have a crime? We do not know, of course. The act of pulling the trigger could range from the most praiseworthy of acts (resulting in a commendation for valor) to the most blameworthy of acts (resulting in the gas chamber).

Even assuming we have criminal homicide rather than justifiable homicide or excusable homicide, we still have no idea whether it is a garden variety criminal homicide (second-degree murder) in any of its four manifestations, aggravated criminal homicide (first-degree murder) in any of its two clear manifestations, or mitigated criminal homicide (manslaughter) in any of its four manifestations. It all depends upon the state of mind of the homicidal agent (at any level of physical participation). With, as in the case of criminal homicide, finely calibrated levels of venality, the bullet is nothing; the spirit that propels the bullet is everything.

THE *MENTES REAE* OF CRIMINAL HOMICIDE:
LEVELS OF BLAMEWORTHINESS

|  | A. | B. | C. | D. |
|---|---|---|---|---|
|  | Intentional Murder | | Unintentional Murders | |
| 1st· MURDER (Aggravated) | 1. PREMEDITATED SPECIFIC INTENT TO KILL | | 1. DESIGNATED STATUTORY FELONY–MURDERS | |
| 2nd· MURDER This is the baseline from which everything proceeds up or down. | 2. SPECIFIC INTENT TO KILL | 2. SPECIFIC INTENT TO HARM | 2. COMMON LAW FELONY–MURDER DOCTRINE | 2. DEPRAVED HEART |
| MANSLAUGHTER (Mitigated) | 3. RULE OF PROVOCATION | 3. RULE OF PROVOCATION | 3. COMMON LAW MISDEMEAN-OR–MAN-SLAUGHTER DOCTRINE | 3. GROSS CRIMINAL NEGLIGENCE |
|  | Voluntary Manslaughter | Involuntary Manslaughters | | |

The *mens rea* or level of blameworthiness of a principal in the first degree by no means controls the *mens rea* or level of blameworthiness of a principal in the second degree or of an accessory before the fact. If three codefendants burst into a motel room and discover the wife of one of them in an act of adultery, what is the crime if the two adulterers are then shot and killed? If the triggerman (the principal in the first degree) is the cuckolded husband, the Rule of Provocation may mitigate his guilt downward to the manslaughter level. The accomplice who hands him the gun, however, will be guilty at least of murder in the second degree, notwithstanding the fact that he is aiding and abetting a mere manslayer. If the third codefendant, who led the suspicious husband to the motel room in the first place, knew full well what would there be found and had been scheming for some time thereby to get rid of the adulterous lover, his premeditated intent to kill would raise his guilt to the first degree notwithstanding the guilt of his fellow participants at lower levels. Conversely, the principal in the first degree (the triggerman) could have possessed a premeditated intent to kill and his aider and abettor, who handed him the gun in a fit of jealous rage, might be the beneficiary of the Rule of Provocation.

Two criminals might jointly participate in a murder, one possessing a premeditated intent to kill and the other a mere specific intent to do grievous bodily harm. One would be guilty of murder in the first degree and the other, guilty of murder in the second degree regardless of which was the triggerman and which was the aider and abettor. Each joint participant in a crime enjoys a unique level of blameworthiness that neither controls nor is controlled by the level of blameworthiness of any other joint participant. An aider and abettor of a manslayer may be guilty of murder and an aider and abettor of a murderer may be guilty of manslaughter.

The only necessary common denominator is participation in the *actus reus* of the homicide.

Two culprits might jointly perpetrate a killing, one of them cold sober as he acted and the other too drunk to be capable of any specific intent. If the intoxicated participant were the aider and abettor, he, incapable of any specific intent of his own, would not be charged with the specific intent of his principal. Conversely, if the intoxicated participant were the triggerman, the cold-blooded aider and abettor could not escape responsibility by piggy-backing on the lesser guilt of his principal. *Cf. State v. Raines,* 326 Md. 582, 594–599, 606 A.2d 265 (1992). According to the appellant's theory, if the triggerman were found to be too mentally incompetent to be criminally responsible, his fully competent aider and abettor might walk from the courtroom. That is not the law.

W. LaFave & A. Scott, *Criminal Law* § 6.7 (1986) "Accomplice Liability" at 581, discusses this independence of one participant's level of guilt from that of another:

"The notion that the accomplice may be convicted, on an accomplice liability theory, only for those crimes as to which he personally has the requisite mental state, is applicable in a variety of circumstances. It means, for example, that one may not be held as an accomplice to the crime of assault with intent to kill if that intent was not shared by the accomplice. But this limitation has proved most significant in the homicide area, where the precise state of mind of the defendant has great significance in determining the degree of the offense. To determine the kind of homicide of which the accomplice is guilty, it is necessary to look to his state of mind; it may have been different from the state of mind of the principal and they thus may be guilty of different offenses. Thus, because first degree murder requires a deliberate and premeditated killing, an accomplice is not guilty of this degree of murder unless he acted with premeditation and deliberation. And, because a killing in a heat of passion is manslaughter and not murder, an accom-

plice who aids while in such a state is guilty only of manslaughter even though the killer is himself guilty of murder. Likewise, it is equally possible that the killer is guilty only of manslaughter because of his heat of passion but that the accomplice, aiding in a state of cool blood, is guilty of murder." (footnotes omitted).

The distinguished English scholar Glanville Williams has discussed this same independence of *mentes reae* among joint participants in the same criminal act, tracing the principle as far back as Sir Matthew Hale's *History of the Pleas of the Crown* in 1736 and Edward Hyde East's *Pleas of the Crown* in 1803. In G. Williams, *Criminal Law* 390–391 (1961), Ch. 9, "Principals and Accessories," it is stated:

"In one type of case the courts have gone quite far in dissolving the conceptual tie between the responsibility of the principal and that of the accomplice. It is possible for a principal in the first degree to be convicted of murder and a principal in the second degree of manslaughter. Thus if D attacks P intending to murder him, and E enters into the affray thinking that only an assault is intended, and D kills P, this is murder in D and manslaughter in E.

There is no reason why a similar result should not be reached for accessories before. P commits a battery upon D; D, in the heat of passion aroused by this, procures E to kill P, which E forthwith does. E (if not affected by the provocation received by D) is guilty of murder; but D is accessory before the fact only to manslaughter.

The more interesting situation is the converse, where the guilt of the secondary party is the greater. One who kills without malice aforethought (e.g., as the unintended result of a common assault) may be guilty of manslaughter, while an abettor or instigator, having malice aforethought, may be guilty of murder. This rule is stated by Hale and East, and it would seem to apply equally to a case where the principal in the first degree alone acts under provocation. As a West Virginian court put it,

'the instigator may act in hot blood, in which case he will be guilty only of manslaughter, while the perpetrator may act coolly, and thus be guilty of murder. The converse, also, may be true; the instigation may be cool and deliberate, the execution in hot blood by a person whom the instigator finds in a condition of unreasoning frenzy.' "

After railing generally at the alleged inconsistency between the verdicts, the appellant narrows his focus and points out that the jury affirmatively found the codefendant Roderick Giles not guilty of involuntary manslaughter of the gross negligence variety. He claims that this verdict was totally incompatible with the appellant's verdict of guilty for aiding and abetting Giles in the commission of an involuntary manslaughter of the gross negligence variety. There are numerous flaws in the appellant's argument.

The first, we point out in passing, is that Giles was not affirmatively found innocent of conduct that might have constituted involuntary manslaughter. With respect to both defendants, Judge Rea gave the jury six possible ways in which each might be guilty of criminal homicide. They were:

1. First-degree premeditated murder
2. Second-degree specific intent murder
3. Second-degree depraved heart murder
4. Involuntary manslaughter of the gross negligence variety
5. Involuntary manslaughter of the unlawful act variety
6. Voluntary manslaughter

Judge Rea further advised the jury that it might wish to consider the more serious charge against each defendant first. If the jury found the defendant not guilty of that charge, it would then go on to consider the next most serious charge. If, however, the jury found the defendant guilty at any particular level or under any particular theory, it would then be unnecessary for the jury to give any further consideration to the remaining charges, constituting at most lesser included offenses or redundant theories of guilt.

In the case against Giles, the jury did just that. It found him not guilty of first-degree premeditated murder but then found him guilty of second-degree specific-intent-to-kill murder. The other charges, arguably representing lesser included offenses, became redundant. With respect to each charge, however, the verdict slip contained a space for checking "guilty" and a space for checking "not guilty." Instead of leaving the last four options unmarked, the jury dutifully marked each of them "not guilty." It is obvious that this was a diligent housekeeping type of response. "Leave no box unchecked." They were asked to select one option from a list of six. Having done so, their knee-jerk reaction was to indicate that the other five had been rejected. It is abundantly clear, however, that the jury did not find Roderick Giles innocent of conduct that might have constituted involuntary manslaughter of the gross negligence variety. It was rather the case that that lesser charge was subsumed in the jury's verdict of guilty of second-degree murder. The very consideration of it on the merits was redundant. This conclusion is even further fortified by Judge Rea's instruction on involuntary manslaughter, "This is a lesser included offense of murder, ladies and gentlemen."

Far more significantly, it does not matter what Roderick Giles was convicted of. The salient fact is that he was found guilty of some level of criminal homicide and the appellant was found to have aided and abetted him. Beyond that, they are each on their own as to their respective levels of guilt. On the fourth issue submitted to the jury in the case against the appellant, the precise question was "Is Defendant Oates guilty or not guilty of involuntary manslaughter?" The jury's verdict was "guilty."

The question on the verdict sheet, to be sure, had been followed by a parenthetical explanation that might in other circumstances have garbled the analysis: "(i.e., did Defendant Roderick Giles commit grossly negligent involuntary manslaughter upon Patrick Stanford and, if so, did Defendant Robert Oates knowingly aid and abet him in doing so?)" It is nonetheless indisputably clear that the jury's verdict that the

appellant was guilty of involuntary manslaughter was based on its conclusion that the appellant was guilty at the manslaughter level of blameworthiness and not that Giles was. That the jury looked beyond the garbled parenthetical and went straight to the heart of the matter was made evident when, in the course of its deliberations, it sent out the following note:

> "If Giles is found guilty, can Oates be found guilty of aiding and abetting of a lesser crime?"

Judge Rea answered by writing "Yes" on the bottom part of the note. In short order, the jury responded with its verdict that the appellant was guilty of manslaughter.

■ The appellant's second contention is that Judge Rea's answer to the jury's note constituted an erroneous jury instruction. The short answer to the contention is that it has not been preserved for appellate review. There was, to be sure, an objection but the objection was on a ground other than the one now being argued. In view of the foregoing discussion, however, an even shorter answer to the contention is our now self-evident holding that Judge Rea's answer to the jury's question was absolutely correct.

*JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.*