675 A.2d 115

Vincent ABERNATHY

v.

STATE of Maryland.

No. 544, Sept. Term, 1995.

Court of Special Appeals of Maryland.

March 27, 1996.

Reconsideration Denied May 28, 1996.

**366**

Jason D. Lamm (Stephen E. Harris, Public Defender, and Melissa M. Moore, Assistant Public Defender, on the brief), Baltimore, for appellant.

Rachel Marblestone Kamins, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, and Patricia Jessamy, State's Attorney for Baltimore City, on the brief), Baltimore, for appellee.

Argued before MOYLAN, BISHOP and BLOOM, JJ.

MOYLAN, Judge.

Although one can commit murder or manslaughter without entertaining the specific intent to kill the victim or anyone else, one cannot commit an attempted murder or attempted manslaughter (or even an assault with intent to murder) without possessing such a specific intent to kill. The disposition of this appeal hinges on the critical difference between the broad *mens rea* (more properly, perhaps, the broad range of *mentes reae*) of consummated criminal homicide and the far more narrow and restricted *mens rea* of inchoate criminal homicide.

The appellant, Vincent Abernathy, was convicted by a Baltimore City jury of 1) attempted murder in the second degree, 2) common law battery, 3) the use of a handgun in the commission of a crime of violence, and 4) the unlawful carrying of a handgun. On this appeal, he raises four contentions:

1) That he was erroneously convicted of a non-existent crime;

2) That the trial judge erroneously instructed the jury on the subject of attempted murder of the depraved-heart variety;

3) That the battery conviction should have merged into the conviction for attempted murder and that the carrying of a handgun conviction should have merged into the conviction for using a handgun to commit a crime of violence; and

4) That it was reversible error for the trial judge to refuse to *voir dire* a juror as to her potential bias developed during the course of the trial.

More than a nutshell version of the facts is not necessary. As part of a senseless neighborhood squabble at approximately 1:20 P.M. on February 6, 1994, at the intersection of Milton Avenue and Biddle Street in East Baltimore, the appellant pulled out a handgun and fired five or six rounds at a group of boys who had been harassing him and his friends. One of the bullets struck and injured Jacklyn Holiday, an innocent pedestrian who was standing with her young son at a nearby bus stop. The appellant was charged with the attempted murder of Jacklyn Holiday.

In presenting its case, the State neither offered proof to show nor even argued that the appellant had harbored any specific intent to kill anyone. At the close of the State's case, the Assistant State's Attorney acknowledged to the court that the State was not "pressing for attempted first-degree murder" because of the lack of any evidence of an intent to kill. Accordingly, the trial judge granted the appellant's motion for a judgment of acquittal as to attempted first-degree murder. At the close of the entire case, the State further acknowledged that it was not pressing for attempted second-degree murder

based on the theory that the appellant possessed any specific intent to kill. It argued, rather, that "what we are presenting to the jury is the depraved heart issue, that he was firing recklessly." In denying further defense motions, the trial judge concluded that the State was presenting to the jury a case of attempted depraved-heart murder and no other variety of second-degree murder.

Accordingly, the trial judge instructed the jury on the subject of depraved-heart murder. She did not define any other variety of murder. She defined depraved-heart murder generally as the killing of another while acting with extreme disregard for human life. There was no specific instruction on attempt law nor was there any mention of the fact that a defendant must possess the intent to kill in order to be found guilty of attempted murder. Following the giving of those instructions, the court adjourned for the day.

By the outset of the next trial day and prior to closing arguments by counsel, the prosecution had entertained second thoughts and advised the judge not to send to the jury a charge that was, in effect, attempted depraved-heart murder. The State had concluded that there was no such crime. Over the objection of both the appellant and the State, the trial judge, disagreeing with their argument, submitted the attempted murder count to the jury.

During closing argument, the State did not argue that the appellant possessed any specific intent to kill. It argued only that, because the jury was considering attempted depraved-heart murder, "the State does not have to prove the existence of intent ... no intent is necessary." The prosecutor castigated the appellant's behavior as "reckless behavior that creates a substantial risk of death or serious physical injury to the victim." The jury returned a verdict of guilty of attempted murder.

### The Jury Instruction in this Case

The trial judge advised the jury that, because the victim had not died, the crime charged in this case was not consummated

murder but only attempted murder. The instruction, however, made no mention of the required *mens rea* (a specific intent to kill) for a conviction of attempted murder. Through omission, it gave the false impression that any *mens rea* that would support a conviction for consummated second-degree murder would also support a conviction for attempted second-degree murder:

Now as you are aware, Ms. Holiday very fortunately did not die as the result of the gunshot wounds she received, so that the alleged crime as to murder is attempted murder and because there is no evidence that the attempt, if there was one, to kill Ms. Holiday was under circumstances where the shots were fired through premeditation or deliberation, the crime charged is murder in the second degree rather than attempted murder in the first degree because the crime of murder in the first degree requires that the person committing the act have done so with premeditation and deliberation and there is no evidence in this case that such occurred. So you need not concern yourselves with the distinction between first degree murder and second degree murder.

Having informed the jury that it need not concern itself with what would have constituted first-degree murder, had the victim died, but only with what would have constituted second-degree murder, the instruction then turned to the subject of second-degree murder. Significantly, however, the only form of second-degree murder that was mentioned was depraved-heart murder. There was no remote allusion to second-degree murder of the specific-intent-to-kill variety. Indeed, the instruction affirmatively advised the jury that there was on the part of the appellant in this case not only the absence of any intent to kill Jacklyn Holiday, but actually the absence of any intent even to harm Jacklyn Holiday:

The murder which you have to consider is that of second degree murder by what we call a depraved heart. *Now the evidence indicates that the shooting of Ms. Holiday was not caused with any intent to harm Ms. Holiday,* who was, according to the evidence, standing on a corner and was the

innocent victim of the gunshots which struck her ... [emphasis supplied].

The instruction then affirmatively advised the jury that, but for the fact of death, the elements of consummated depraved-heart murder, on the one hand, and attempted murder, on the other hand, are one and the same. That equating of the two sets of elements clearly included an equivalency in the mental elements as well as in the physical elements:

> Now he is charged with the crime of second degree murder by a depraved heart, and let me tell you what that is. Second degree murder is the killing of another person, and here of course we're talking only of attempted second degree murder. *The same elements apply. The only difference is that the crime not have been completed* and Ms. Holiday survived.

The instruction then, other than making allowance for the fact that it was dealing with a non-fatal injury instead of a death, essentially tracked Maryland Pattern Jury Instruction—Criminal 4:17.8, defining consummated second-degree murder of the depraved-heart variety. The jury was, in effect, told that the *mens rea* of "acting with extreme disregard for human life" was the only *mens rea* it need find to bring in a conviction for attempted second-degree murder:

> Second degree murder is the killing of another person by— second degree murder by depraved heart is *the killing of another person while acting with an extreme disregard for human life.* In order to convict the Defendant of second degree murder by depraved heart, the State must have proven beyond a reasonable doubt that the conduct of the Defendant caused the injuries to Ms. Holiday and that had she died of those injuries, the crime would have been murder ... and *that the Defendant, conscious of such risk, acted with extreme disregard of the life endangering circumstances.* [emphasis supplied].

As our analysis now turns to the legal inadequacy of that instruction, let it be clear what this opinion is *not* considering. We are not dealing in this case with the possible legal suffi-

ciency of the evidence to give rise to a permitted inference of an intent to kill, but only with the failure of a jury instruction to advise the jury that it must draw such an inference in order to convict of attempted murder.  It may well be that in certain situations, the evidence that could support a conviction for depraved-heart murder, should death result, might also give rise to a permitted inference of a specific intent to kill.  That issue, however, is not before us in this case and we are intimating nothing with respect to it.  We are only dealing, in a factual vacuum and as an abstract academic question, with the legal correctness of the jury instructions.

### Attempted Second–Degree Murder Is A Crime

██  The appellant initially complains that he was convicted of a non-existent crime.  "If it were so, it was a grievous fault."  He claims specifically that he was convicted of the non-existent crime of attempted depraved-heart murder.  That, however, was not literally the case.  He was convicted of attempted murder in the second degree.  That is a crime.  Murder is a crime.  Murder in the second degree is a crime.  Attempted murder in the second degree is a crime.  The fact that the single crime of murder may be established by any of four alternative rationales does not thereby fragment it into four separate crimes.  The fact that any of four separate mental states may constitute the *mens rea* of the crime of murder does not thereby fragment it into four separate crimes.

The appellant, however, is on the right trail, even if he has not yet cleanly differentiated the precise scent that he should be following.  What he is accurately sensing is that he was improperly convicted of what may be an existent crime, but only on the basis of a non-existent rationale.  Although the depraved-heart state of mind may serve as an adequate *mens rea* for a conviction of consummated murder, it does not exist as an available *mens rea* to support a conviction for attempted murder.  That, however, is a different contention than a claim that he was convicted for a non-existent crime.  It is an argument, however, that takes on persuasive force in the

context of the appellant's next contention, to which we now turn.

### The Singularity of The Attempted–Murder Mens Rea

The erroneous jury instruction, given over the protest of both the appellant and the State, encouraged the jury to conclude that the appellant's extreme disregard for human life, a *mens rea* which could have sustained a conviction for murder had Jacklyn Holiday died, could also sustain a conviction for the attempted murder of Jacklyn Holiday. Commendably, the State concedes before us that the instruction constituted reversible error and agrees that the conviction for attempted murder must be reversed.

Even in the absence of appellate controversy, however, it behooves us to write briefly on this subject because no published Maryland opinion has yet dealt squarely with the issue of the required *mens rea* of attempted murder in the context of what might have been, had death resulted, the depraved-heart variety of consummated murder.

When the conduct of a defendant is responsible for the death of a victim, not one, but four, mental states or *mentes reae* are now deemed sufficiently reprehensible or blameworthy to support the conviction for the crime of murder. Without recapitulating the history of the law of homicide, which has in any event been fully treated by us in *Glenn v. State,* 68 Md.App. 379, 384–85, 511 A.2d 1110, 1113–14 (1986) and *Oates v. State,* 97 Md.App. 180, 186, 627 A.2d 555, 558–59 (1993), there are now four types or kinds of murderous *mens rea,* which are almost universally referred to as:

| A | B | C | D |
|---|---|---|---|
| INTENT TO KILL MURDER | INTENT TO COMMIT GRIEVOUS HARM MURDER | FELONY– MURDER | DEPRAVED– HEART MURDER |

■ Although the *mens rea* of consummated criminal homicide (murder and manslaughter alike) has been multiplied by four, that is not the case with the *mens rea* of inchoate criminal homicide (attempted murder in either degree, attempted voluntary manslaughter, assault with intent to murder). The exclusive and indispensable *mens rea* of any of the inchoate criminal homicides is the specific intent to kill. In terms of its *mens rea,* the inchoate crime is far more austerely restricted than is the consummated crime.

■ Specific-intent-to-kill murder is an intended murder. The other three forms of murder are unintended murders. At the manslaughter level, the specific intent to kill yields voluntary manslaughter; all other mental states yield varieties of involuntary manslaughter. The inchoate crimes of attempted murder and attempted manslaughter are, because of their narrow *mens rea,* only antecedent to what would have been, had death resulted, intentional murders and voluntary manslaughters. It is self-evident that there cannot be an attempt to commit an unintended murder or an involuntary manslaughter. One cannot intend to do an unintended or involuntary thing.

## A. Assault With Intent to Murder: The Specific Intent to Kill Is Required

■ In the case of the essentially indistinguishable inchoate criminal homicide of assault with intent to murder, it is now well established that the only *mens rea* that will support a conviction is the specific intent to kill. In *Glenn,* 68 Md. App. at 387–88, 511 A.2d at 1113–14, this Court held squarely that, although consummated murder broadly embraces four different possibilities for a murderous *mens rea,* assault with intent to murder is, by definition, confined to the single *mens rea* of a specific intent to kill:

> Assault with intent to murder is, by its very wording, a specific intent crime. The obvious question is, "The specific intent to do what?" The obvious answer is, "The specific intent to bring about the death of the assault victim." In

terms of the clear and unambiguous meaning of words, it is inconceivable that there could be an intent to murder the victim that did not intend for the victim to die. Except in the pages of Bram Stoker, it simply is not contemplated that the victim of an intended murder will continue to be alive. Intended murder, by definition, comprehends, *inter alia*, an intended killing, to wit, an intent to kill.

There may, of course, be unintended murder without the intent to kill. It is for that reason that an unintended murder (actual or hypothetical) does not establish an anterior assault with intent to murder. Since murder may be unintended as well as intended, it is obviously broader than assault with intent to murder. [footnote omitted].

The inchoate homicide of assault with intent to murder came before the Court of Appeals in *Franklin v. State*, 319 Md. 116, 571 A.2d 1208 (1990). The trial judge there had instructed the jury that a specific intent to murder was not necessary to sustain the conviction and that it would suffice if there had been an intention to commit grievous bodily harm. Rejecting earlier case law that had indicated squarely to the contrary, the Court of Appeals held clearly that the only *mens rea* that could support a conviction for the inchoate homicide was that of a specific intent to kill:

> The crime of assault with intent to murder is a statutory offense. The elements of the offense have not been defined by statute, but in [*State v.*] *Jenkins* [307 Md. 501, 515 A.2d 465 (1986)] we left no doubt that assault with intent to murder requires proof of a specific intent to kill. We explained that assault with intent to murder is clearly distinct from the offense of assault with intent to do grievous bodily harm.

319 Md. at 124, 571 A.2d at 1212 (citations omitted).

## B. Attempted Murder: The *Mens Rea* of a Specific Intent to Inflict Grievous Bodily Harm Will Not Suffice

■ Turning attention to the closely related inchoate homicide of attempted murder, we note that the law is also now well settled that the *mens rea* of a specific intent to inflict

grievous bodily harm, adequate to support a conviction for consummated murder, will not sustain a conviction for attempted murder. In *Earp v. State,* 76 Md.App. 433, 545 A.2d 698 (1988), the conviction was for attempted murder in the second degree. The trial judge, in a court trial, found that Earp did not harbor a specific intent to kill but only a specific intent to inflict grievous bodily harm. This Court reversed the conviction, pointing out the inadequacy of the intent to commit grievous bodily harm to sustain a conviction for the inchoate homicide:

> A conviction for attempted second degree murder may not be sustained upon proof that the accused intended only to commit grievous bodily harm; a conviction for attempted second degree murder may only be sustained if the perpetrator is found to have harbored the intent to kill his victim.

76 Md.App. at 440, 545 A.2d at 702. In affirming, the Court of Appeals held squarely in *State v. Earp:*

> [W]here an attempted murder is charged, the State must show a specific intent to kill—an intent to commit grievous bodily harm will not suffice.

319 Md. 156, 164, 571 A.2d 1227, 1231 (1990):

### C. Attempted Murder: The *Mens Rea* of Felony–Murder Will Not Suffice

The law is also well settled that the *mens rea* that would support a conviction for felony-murder, should death result, is not adequate to support a conviction for attempted murder. In *Bruce v. State,* 317 Md. 642, 646, 566 A.2d 103, 105 (1989), Chief Judge Murphy held explicitly for the Court of Appeals:

> Because a conviction for felony murder requires no specific intent to kill, it follows that because a criminal attempt is a specific intent crime, attempted felony murder is not a crime in Maryland.

### D. Attempted Murder: The *Mens Rea* of a Depraved Heart Will Not Suffice

By parity of reasoning, we have no difficulty in completing the matrix and holding squarely that the *mens rea* of a

wanton disregard for human life, which will support a conviction for depraved-heart murder should death result, will not support a conviction for antecedent attempted murder. For an attempted murder in either degree (and even for an attempted voluntary manslaughter) nothing but the specific intent to kill will serve as the necessary *mens rea.*

The instruction in this case on the subject of depraved-heart murder was not only inadequate but affirmatively misleading. As the State agrees, the conviction for attempted murder must be reversed. To borrow the expression of the appellant, which though technically imprecise is nonetheless effectively expressive, there is no such crime as attempted depraved-heart murder.

### The Use of a Handgun To Commit a Crime of Violence

The appellant was also convicted of using a handgun to commit a crime of violence. The crime of violence was the attempted murder of Jacklyn Holiday. In view of the State's concession that the conviction for using a handgun to commit a crime of violence should be reversed, we have no need to address the merits of either 1) why this conviction should be reversed or 2) whether, under some theory or another, it could be salvaged. We are simply accepting the State's concession and operating only on the basis of it.[1]

### Merger

The appellant's third contention, the merger of battery into attempted murder and the merger of carrying a handgun into

---

1. With respect to the possible merits of an issue such as this as those merits might arise under certain circumstances, *see Ford v. State,* 274 Md. 546, 337 A.2d 81 (1975) and *Shell v. State,* 307 Md. 46, 512 A.2d 358 (1986). Although the evidence might possibly have been sufficient to show that the appellant committed some "crime of violence" other than the attempted depraved-heart murder that was submitted to the jury, there could still be attendant problems caused by the erroneous jury instruction with respect to the high profile "crime of violence" that the jury was invited to consider. As a practical matter, the appellant only received a ten-year concurrent sentence on the handgun conviction in any event, whereas he received a twenty-year sentence for common law battery.

the use of a handgun, is based·on the supposition that he might not prevail on his second contention. Since he has prevailed with respect to reversing the convictions on the greater charges, the merger argument is moot. There are no longer any greater inclusive offenses into which the lesser included offenses could merge.

### *Miscellaneous Trivia*

■ The appellant's final contention is much ado about nothing. In the course of the trial, the appellant's sister allegedly heard Juror No. 8 make a passing remark to a fellow juror characterizing the lifestyle of one of the witnesses. Rose Wright had just finished testifying. Juror No. 8 allegedly made the casual observation, following that testimony, "That's what you call a dysfunctional family." Reviewing the testimony of Rose Wright, one can hardly gainsay the accuracy of the observation. That, of course, is beside the point

Whether the remark was made or not, it was inconsequential. Jurors are not Sphinxes and, inevitably, they make comments to each other in the course of a trial. It is nothing more than an instinctive human reaction to the events unfolding around one, no more significant than the raising of an eyebrow or the taking of a deep breath. It does not constitute deliberation on the merits of the case and it is not evidence of bias. Bias or prejudice is what a juror brings to the trial before it even begins. The process of beginning to make tentative judgments as the trial progresses, by way of contrast, is something quite different and it is unavoidable.

In any event, we do not see a clear abuse of the trial judge's discretion in not pursuing further this will-o'-the-wisp. Part of the discretion vested in a trial judge is to prevent a trial from being side-tracked by trivia.

*JUDGMENTS OF CONVICTION FOR ATTEMPTED MURDER AND THE USE OF A HANDGUN IN A CRIME OF VIOLENCE REVERSED; JUDGMENTS OF CONVICTION FOR BATTERY AND CARRYING A HANDGUN*

378

AFFIRMED; COSTS TO BE PAID BY MAYOR AND CITY
COUNCIL OF BALTIMORE.