699 A.2d 473

**Curtis Maurice WILLIAMS**

v.

**STATE of Maryland.**

**No. 1243, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Sept. 3, 1997.

Amy Stein (Jennifer P. Lyman, Assigned Public Defender, on the brief), Washington, DC, for Appellant.

Kathryn Grill Graeff, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for Appellee.

Argued before WENNER, CATHELL and SALMON, JJ.

On Reconsideration*

CATHELL, Judge.

Curtis Maurice Williams, appellant, was convicted by a jury in the Circuit Court for Anne Arundel County of assault with intent to maim Royce Sollers, reckless endangerment, assault and battery, and of the use of a handgun in the commission of a felony. The reckless endangerment and assault and battery convictions were merged into the assault with intent to maim

---

* Editor's Note: This opinion supersedes a May 2, 1997 opinion. That opinion initially appeared in an advance sheet at *116 Md. App. 482, 697 A.2d 487*, but was withdrawn from the bound volume.

conviction prior to sentencing. Appellant was sentenced to concurrent sentences of eight years with two years suspended.

Appellant presents three issues:

I. Whether a new trial is required when the judge instructs the jury on transferred intent when the doctrine of transferred intent does not legally apply to the crimes charged.

II. Whether a new trial is required when the judge refuses to instruct the jury on self defense even though the jury reasonably could have concluded that the complainant and his companion threatened the defendant and that he feared they were advancing on him with a concealed gun.

III. Whether a defendant is entitled to a new trial when the judge improperly allowed the prosecution to bolster the trial testimony of a weak witness with a prior written statement that fell under no hearsay exception.

## The Facts

Both appellant and the State have included extensive factual statements in their briefs. We shall recite only those facts that are pertinent to our resolution of the issues presented.

Appellant and the victim, Royce Sollers, became engaged in a scuffle as they attempted to break up a fight between two women that had itself arisen out of accusations by Sollers's sister that appellant's girlfriend had been "messing around" with Sollers. Sollers left the scene asserting that he would "jump" appellant. Later, on two occasions, Sollers and his friends confronted appellant, once with sticks and pipes, but no actual contact occurred. There was evidence that on one occasion Sollers said he was going to get his "tool," which appellant and the others took to mean his gun. Accordingly, appellant bought a handgun that, on the date at issue, was in his "sports bag."

On the day that Sollers was shot, two of appellant's friends were approached by Sollers and Derrick Jones. There was some evidence that Jones had one of his hands wrapped in a towel, which he began to unravel as he approached appellant's

two friends.  At this point, another person left to get appellant, who was changing clothes to play basketball.  Appellant then approached the scene and, unseen by them, observed the confrontation between his friends and Sollers and Jones.  He testified that Jones was unwrapping something from around his arm as if he had a gun concealed beneath the wrapping. Williams went to his sports bag, got his gun, and shot Sollers. He initially testified that he meant to shoot Jones but, by accident, hit Sollers.

Williams was subsequently charged, convicted, and sentenced as we have indicated.

I.  Whether a new trial is required when the judge instructs the jury on transferred intent when the doctrine of transferred intent does not legally apply to the crimes charged.

The trial judge instructed the jury as follows:

> In this case there is a concept called transferred intent. Essentially what that means is that if you have three people, A,B and C, and A intends to shoot C, and either accidentally or in the process shoots B, the point is that the intent follows the bullet.  The intent is transferred from C to B, the person who was actually shot.  All right?

Appellant argues that the instruction was erroneous and constitutes prejudicial error.  He proffers our case of *Harvey v. State,* 111 Md.App. 401, 681 A.2d 628,[1] *cert. denied,* 344 Md. 330, 686 A.2d 635 (1996), in support of his argument.  In *Harvey,* we noted Harvey's argument as to the applicability of transferred intent, an argument essentially the same as appellant's in this case:

---

[1] Neither our opinion in *Harvey* nor the Court of Appeals's denial of certiorari had been filed at the time Judge Greene gave the instruction at issue.  Accordingly, he did not have the benefit of those actions.  We emphasize that no criticism of the trial court's decision is meant or implied.  Moreover, we note that the Court of Appeals in *Ford v. State,* 330 Md. 682, 625 A.2d 984 (1993), struggled with the very concept that gave rise to the instruction at issue.

The appellant's primary contention is that the doctrine of transferred intent is inapplicable to the crime of assault with intent to murder and erroneously relieved the State of its obligation to prove the required *mens rea* of a specific intent to kill directed at the actual assault victim, Tiffany Evans.

*Id.* at 406, 681 A.2d 628.

■ In *Harvey*, we agreed, as we do here, that the doctrine of transferred intent does not apply when the unintended victim is not killed. We said in *Harvey* that the classic case of transferred intent "was that in which lethal force was directed toward an intended victim, missed its target, and killed an unintended victim," *id.* at 414, 681 A.2d 628, and noted: "[t]hat was the context in which the doctrine was hammered out as part of English common law." *Id.* We later opined:

The business of "transferring" the *mens rea* of a specific intent to kill from an intended victim to an unintended victim (or, more properly, simply applying it to the unintended victim) becomes far more complex when dealing with inchoate criminal homicides such as assault with intent to murder, attempted murder (in either degree), and attempted voluntary manslaughter. The complexity is illustrated by the approach initially taken by the Court of Appeals in *State v. Wilson*, 313 Md. 600 [546 A.2d 1041] (1988); a correction of course by a fragmented Court of Appeals in *Ford v. State*, 330 Md. 682 [625 A.2d 984] (1993); and a revisiting of that correction of course by a similarly fragmented Court of Appeals in *Poe v. State*, 341 Md. 523 [671 A.2d 501] (1996).

*Harvey*, 111 Md.App. at 422–23, 681 A.2d 628.

We later noted that initially the Court of Appeals, in *State v. Wilson*, 313 Md. 600, 546 A.2d 1041 (1988), had upheld the doctrine of transferred intent in a case in which the unintended victim was shot but did not die. We then discussed in *Harvey* that five years after *Wilson* was decided, the Court of Appeals had made, *albeit* as *dicta*, a change in course. We stated:

Five years after *Wilson*, a four-judge majority in *Ford v. State*, 330 Md. 682 [625 A.2d 984] (1993), in *dicta* to be sure but in extensive and well-considered *dicta*, effected a massive correction of course. It reasoned that the *Wilson* rationale was incorrect and that the transferred intent doctrine should not have been applied by *Wilson* to any of the inchoate homicides such as attempted murder or attempted voluntary manslaughter or assault with intent to murder. Judge Chasanow argued that the transferred intent doctrine is appropriate for a consummated homicide perpetrated on an unintended victim but has no similar applicability in the case of inchoate homicides. The *Ford* majority stated flatly, 330 Md. at 714 [625 A.2d 984]:

> We believe *Wilson* should not have applied transferred intent to attempted murder.

*Harvey*, 111 Md.App. at 426, 681 A.2d 628.

We then considered the Court of Appeals's then most recent case involving transferred intent, *Poe v. State*, 341 Md. 523, 671 A.2d 501 (1996), saying:

> In *Poe v. State*, 341 Md. 523, 529 [671 A.2d 501] (1996), the Court of Appeals summarized its earlier statement in *Ford:*
>
> > We stated in *Ford* that transferred intent does not apply to attempted murder. *Id.* (disapproving application of the doctrine of transferred intent to attempted murder in *State v. Wilson*, 313 Md. 600 [546 A.2d 1041] (1988)).... [T]he doctrine of transferred intent does not apply to attempted murder when there is no death.
>
> *Poe* made it clear, 341 Md. at 530 [671 A.2d 501], that when the unintended victim is *not* killed, the transferred intent doctrine will not apply:
>
> > In *Ford*, we made clear that if a defendant intends to kill a specific victim and instead wounds an unintended victim *without killing either*, the defendant can be convicted only of the attempted murder of the *intended* victim and transferred intent does not apply. This is not true where, as in the case *sub judice*, the defendant intends to murder one victim and instead kills an unintended victim.

(Emphasis in original; footnote and citation omitted).

The concurring opinion of Judge McAuliffe, joined by Judges Rodowsky and Karwacki, took strong exception to the effort to repudiate *Wilson*. There were four votes, however, for the repudiation. The same four-to-three split from *Ford* also resurfaced in *Poe v. State*, with Judge Raker taking up the cudgels laid down by Judge McAuliffe.

We are not bound, of course, by a three-judge dissent nor by the *dicta* of even a four-judge majority. We are persuaded, however, that the majority's bottom-line conclusion is the sounder position. It is, after all, only with respect to *consummated homicide* that the law necessarily must concern itself with a notion like transferred intent. There is a necessity principle at work that is not present when no death has resulted.

*Harvey*, 111 Md.App. at 426–28, 681 A.2d 628 (footnotes omitted). We then held in *Harvey:*

The unintended victim, Tiffany Evans, was not killed. It was, therefore, error to have instructed the jury on the subject of transferred intent. The error was obviously prejudicial in that the State was thereby erroneously relieved of its obligation, on the charge of assault with intent to murder, to prove the required *mens rea* of a specific intent to kill Tiffany Evans. The conviction for assault with intent to murder must be reversed.

*Id.* at 433–34, 681 A.2d 628. The Court of Appeals denied certiorari in *Harvey*. The question posed by the State in its petition for certiorari in that case was the identical issue the State now asks us to reconsider:

Did the Court of Special Appeals incorrectly find that the trial court erred in instructing the jury regarding the doctrine of transferred intent where the intended target was not hit and the victim, an innocent bystander, was shot but not killed?

■ The State, citing to the Court of Appeals's cases decided before *Ford* and *Poe*, asks us to reconsider the holding in *Harvey*. We considered those prior cases in *Harvey*. We

analyzed the Court of Appeals's cases of *Ford* and *Poe* and interpreted them so as to prohibit the theory of transferred intent unless the unintended victim is killed. The Court of Appeals declined to take certiorari in *Harvey*. To the extent that *Ford*'s or *Poe*'s holding was *dicta*, we have elevated it to a holding that the Court of Appeals has declined to review. Accordingly, we shall not reconsider it. It is the law. We hold, therefore, that the giving of the transferred intent instruction was prejudicial error and will vacate appellant's conviction for assault with intent to maim.

In *Harvey*, we also noted that because we were reversing the assault with intent to murder conviction, there was nothing into which the reckless endangerment conviction could merge, and thus we declined to consider whether the trial judge should have merged those counts into the more serious offense. In the case *sub judice*, the trial judge merged the reckless endangerment and assault and battery convictions into the assault with intent to maim conviction that we are vacating. On remand, the trial court shall have to reconsider sentences on the reckless endangerment and assault and battery convictions.

II. Whether a new trial is required when the judge refuses to instruct the jury on self defense even though the jury reasonably could have concluded that the complainant and his companion threatened the defendant and that he feared they were advancing on him with a concealed gun.

We perceive that the trial judge gave sufficient instructions. We explain.

Maryland Rule 4–325(c) provides that a "court need not grant a requested instruction if the matter is fairly covered by instructions actually given." The trial court instructed the jury:

> You have heard evidence that the defendant acted in defense of another person or persons. The defense of others is a defense and you are required to find the defendant not guilty if all of the following four factors are present.

These factors must be present for that defense to apply: the defendant actually believed that the person/*defendant* was in immediate and imminent danger of bodily harm; the defendant's belief was reasonable; the defendant used no more force than was reasonably necessary to defend the person/*defendant* in light of the threatened or actual force; and the defendant's purpose in using force was to aid the person/*defendant* or persons/*defendant*. [Emphasis added.]

As can be seen from the instruction itself, the trial judge expanded the "defense of others" instruction to include appellant.

Moreover, the evidence indicated that appellant was primarily acting in the defense of his friends. He testified as to why he shot at Jones and Sollers:

A   I was scared for Prince and Jamal, because I knew Prince for four years and Jamal for eight.

Q   What did you think Derrick was going to do with whatever he had?

A   I thought he was going to try to kill them.

Q   And why did you think that?

A   Because Royce had—he had said, you know, he was gonna come back, and he was gonna shoot us, and he was gonna get us, and all this, and I was scared for them.

He was expressly asked why he had fired at Jones. He responded: "[T]he first thing that popped in my mind was he's gonna shoot them. I thought he was gonna shoot them and I wanted to shoot him first so my friends won't be injured." He responded affirmatively at another point that he had been scared "for Prince and Jamal," his two friends.

Prior to the above testimony, on direct examination, appellant testified:

Q   At the point where you came around the corner the second time with the gun, did you think that Derrick had any type of weapon?

A   To me there was no doubt in my mind that he had some kind of weapon.

Q What weapon did you think he had?

A I thought he had a gun.

Q And how were you feeling at that time? What were you feeling?

A I was scared for Prince and Jamal, because I knew Prince for four years and Jamal for eight.

Q What did you think Derrick was going to do with whatever he had?

A I thought he was going to try to kill them.

Q And why did you think that?

A Because Royce had—he had said, you know, he was gonna come back, and he was gonna shoot us, and he was gonna get us, and all this, and I was scared for them.

. . . .

Derrick was right here and Royce was right here. Jamal was—he was right here. Prince was right here. When I came around this corner—I had peeped over the bushes. When I came around this corner I seen them and then when Derrick—

. . . .

A (Marking on exhibit.) And when I came around the corner, Derrick—I seen Derrick look at me, and then he kind of turned towards me, but he stepped back, and when I pulled the trigger—

This was actually appellant's second foray around the corner and through the bushes. He had actually peered around the corner and saw Sollers and Jones accosting his friends, but was himself unseen. At that prior point, no one was about to shoot him. At the time, he was only afraid for his friends. He then went to his sports bag around the corner, got his gun, and initiated the affray with Sollers and Jones by attempting to shoot Jones in an effort to defend his friends. He was asked what was going through his mind that caused him initially to retreat, get his gun, and then return shooting.

BY [APPELLANT'S COUNSEL]:

Q Why were you aiming at Derrick?

A   Because I thought that maybe he was gonna—you know, the first thing that popped in my mind was he's gonna shoot them.   I thought he was gonna shoot them and I wanted to shoot him first so my friends won't be injured.

■   Ultimately, he was asked a question that elicited the only response indicating he was fearful for himself:

Q   When—[you] thought that Derrick was going to shoot Prince or Jamal.   You were afraid for them.   Were you ever at that point afraid for your own safety?

A   I feel, you know, like if I didn't have the gun in my book bag, I would have *probably* came around the corner, not looking, or if I didn't even see them at first, I'd have came around the corner and he would have—I know if he had had something, he would have shot.

Q   When you say he, who are you referring to?

A   Derrick.

Q   So at the point that you shot, were you also afraid for your own safety?

A   As well.   [Emphasis added.]

Appellant's statements do not rise to the level necessary to generate a self-defense instruction in the first instance.   His statement that, if he had come around the corner unarmed and had been seen, he might have been shot, does not suffice. He came around the corner, was not seen, retreated to his bag, retrieved his gun, and returned firing.   He could have gotten his sports bag and left the scene.   No one was about to shoot him.   They did not know he was there.   His statement that he was scared when he fired a shot does not generate the need for a self-defense instruction.   The fact that when one shoots someone else he is fearful that his victim might shoot back is not determinative as to the issue of self-defense.

The trial court did not err in the instructions that it gave. The evidence supported nothing further.

III.   Whether a defendant is entitled to a new trial when the judge improperly allowed the prosecution to bolster the

trial testimony of a weak witness with a prior written statement that fell under no hearsay exception.

At trial, Jones testified:

Q   Okay.  Do you know who shot Royce?

A   I think they said the boy's name was Curtis.

[APPELLANT'S COUNSEL]:  Objection, Your Honor. Move to strike.

BY [STATE'S ATTORNEY]:

Q   No.  I'm asking you.

THE COURT:  Sustained.  Go ahead.  Next question.

THE WITNESS:  Huh?

BY [STATE'S ATTORNEY]:

Q   I'm asking you who shot him.

A   I don't know him by name.  I didn't know him by name.

. . . .

Q   Do you see the person in the courtroom today that shot Royce?

A   No.  Yeah.

Q   Which one?

A   I don't understand.

Q   Well, do you see—let me—not much ways for me to rephrase it.  Do you see the person in the courtroom today that shot your friend Royce?

A   (No response.)

Q   Okay.  Let me rephrase that a little bit.  Look around the courtroom.  Do you see the individual that shot Royce Sollers?

A   (No response.)

Q   You're not looking around the courtroom.  (Pause.) What's your answer, sir?

A   (Pause.)  No, I don't see him.

Q   You don't see the person?  All right.  Do you remember giving a statement to the Anne Arundel County Police after the shooting occurred?

A   Yeah.

Q   And you have a copy of that statement in front of you right now, do you not?

He was then permitted to read a prior statement he had given to the police in which he did identify appellant as the shooter. This exchange followed:

Q   Next question.   "Who got shot?"   What was your response?

A   "Royce."

. . . .

Q   All right.   Next question.   "Who shot him?"   What was your response?

A   "A nigger named Curtis."   Or Curtis.   I don't know his last name.

Q   Okay.   Do you know Curtis Williams?

A   No, I don't know him like that.   I don't know him. They asked me his last name, I told them I didn't know his last name when they asked me.

. . . .

Q   How many people named Curtis do you know?

A   About two, three.

. . . .

Q   Would you read the question [from the prior statement] for us?

A   "How long have you known Curtis?"

Q   And what was your response?

A   "About three years."

. . . .

Q   Was your memory better about what happened when you gave this statement . . . or was it better today?

A   It was better . . . when I gave it.

Jones's prior statement that he had given to the police was introduced into evidence.   Appellant argues that portions of the statement that were consistent with Jones's trial testimony should not have been admitted.   Appellant's objection to

the admission of the statement was included in the following argument:

[APPELLANT'S COUNSEL]: Your Honor, I think the statement does not come in. The witness got on the stand and testified as to some things. [The State's Attorney] challenged him.

He had him read or look at the statement in regard to the areas that he had denied, the witness had denied, then the witness read or acknowledged at that point what he had previously said he did not remember or that he denied.

I think if [the State's Attorney] is going to impeach, and impeach his own witness, once there is a denial or some indication that the witness does not remember or whatever, [the State's Attorney] can present something to the witness to try to impeach him, jog his memory at that point.

If the witness at that point continues to deny or say he can't remember, then the impeaching evidence would come in. [The State's Attorney] would, in effect, prove up what the witness has denied or has indicated that he can't remember.

We don't have that situation here, because [the State's Attorney] presented the paper, the statement to the witness and those areas which he denied or said he did not remember. He did give a response at that point. That statement does not come in.

■ As can readily be seen from the above exchange, concerning the admissibility of the statement, appellant made no objection below to the admission of the statement due to the fact that it included consistent statements. Likewise, appellant never asked the trial court to redact the portions of the statement appellant believed to be prior consistent statements. Accordingly, even if error, it was not preserved. Moreover, in light of the wealth of other evidence, we would perceive that even if it was error and had been preserved, it would be, in our view, harmless.

Appellant filed a Motion for Reconsideration of our opinion that was originally filed on May 2, 1997. We have recalled

that opinion to address the important issue presented in the motion to reconsider. As the matter contained in our prior opinion was not incorrect, we have not changed it but shall address the new issue now presented by adding this section.

Appellant asserts in his motion that his conviction for using a handgun in the commission of a felony must be vacated because his conviction for the underlying felony was vacated. We agree. In resolving this issue, we shall address an issue we have not heretofore fully explained.

We initially note that this case was tried by a jury, and the jury's verdicts were completely consistent. It convicted appellant of both the underlying felony and the handgun offense. The case law cited by appellant, whether correctly interpreted or otherwise, is of only tangential importance. We explain.

Had the jury in the case at bar acquitted appellant of the underlying felony but convicted him of the handgun offense, its verdicts would have been inconsistent. We, however, would have been required to affirm the handgun conviction. In *Ford v. State*, 274 Md. 546, 551, 337 A.2d 81 (1975), the Court of Appeals stated:

> [W]hen the trier of fact [in *Ford*, a jury] considers an indictment containing both a … handgun count and a felony or crime of violence count, a conviction on the former can still be sustained even if the trier of fact returns a finding of not guilty on the latter.

It is important to note that *Ford* involved jury verdicts. There are later cases in which the courts have held that other types of inconsistent verdicts are impermissible.

In *Garland v. State*, 29 Md.App. 27, 28, 349 A.2d 374 (1975), *rev'd*, 278 Md. 212, 362 A.2d 638 (1976), decided after *Ford*, the defendant was convicted by a jury of second degree murder and unlawful use of a handgun. We ultimately re-

versed the conviction for second degree murder.[2] As to the handgun conviction, we stated:

It follows that with the reversal of the conviction for the underlying felony, the conviction for the handgun violation, predicated of necessity upon it, must also be reversed.

*Id.* at 32, 349 A.2d 374. That statement is technically correct. *Garland,* however, did not involve a jury inconsistency. It was, as is also clear in the case *sub judice,* an inconsistency created by an appellate court's vacating of the underlying felony.

In *Abernathy v. State,* 109 Md.App. 364, 376, 675 A.2d 115 (1996), also a jury trial, the State conceded that the handgun conviction should be reversed. We accepted the concession but noted the holding in *Ford* and in another case that we shall now discuss.

In *Shell v. State,* 307 Md. 46, 54–55, 512 A.2d 358 (1986), Judge Eldridge, for the Court, stated:

Thus, convictions based on inconsistent jury verdicts are tolerated because of the singular role of the jury in the criminal justice system. . . . [I]nconsistencies may be the product of lenity, mistake, or a compromise to reach unanimity. . . . [C]ontinual correction of such matters would undermine the historic role of the jury as the arbiter of questions put to it.

In the present case, however, the inconsistent verdicts were rendered by a judge, not by a jury. The *Ford* holding does not justify inconsistent verdicts from the trial judge. [Citations omitted.]

██ As we view this area of the law, inconsistent verdicts from juries are tolerated because of the unique role of juries

---

2. We reversed the conviction because we held that the jury instructions were improper. We were, in turn, reversed on that issue by the Court of Appeals. Because the Court of Appeals was reversing our reversal of the trial court's conviction, based upon its holding that the instructions given were not erroneous, the issue of inconsistent verdicts did not arise in that proceeding. The history of that case on remand is not reported.

in our judicial system. Inconsistent verdicts, however, are not generally tolerated in a non-jury context.

The trial below resulted in jury verdicts that were completely consistent. With our action in the case *sub judice,* vacating the underlying felony, we, not the jury, have created the inconsistency. With no jury aura present, there is no reason for us to tolerate any inconsistency in the verdicts. Accordingly, we shall also vacate appellant's conviction on the handgun charge. We shall, therefore, modify our prior mandate.

As we have indicated, this matter was brought to our attention for the first time in appellant's motion to reconsider. It was not presented as a part of appellant's original issues on appeal. For that reason, were we inclined to do so, we need not have granted this motion to reconsider and need not have modified our prior opinion. We do so to emphasize the difference between inconsistent verdicts resulting from the actions of a jury and inconsistent verdicts resulting from appellate court vacations of underlying felonies.

**JUDGMENTS OF CONVICTION FOR ASSAULT WITH INTENT TO MAIM AND FOR THE USE OF A HANDGUN IN THE COMMISSION OF A FELONY ARE VACATED; JUDGMENTS OF CONVICTIONS OTHERWISE AFFIRMED; CASE REMANDED FOR A NEW TRIAL ON THE CHARGES OF ASSAULT WITH INTENT TO MAIM AND THE HANDGUN CHARGE, FOR RECONSIDERATION OF SENTENCING ON THE RECKLESS ENDANGERMENT AND ASSAULT AND BATTERY CONVICTIONS, AND FOR OTHER PROCEEDINGS, IF ANY, CONSISTENT WITH THIS OPINION; COSTS TO BE PAID 50% BY ANNE ARUNDEL COUNTY, 50% BY APPELLANT.**