## JOHN MICHAEL GLADDEN *v.* STATE OF MARYLAND

[No. 595, September Term, 1973.]

*Decided March 15, 1974.*

The cause was argued before MORTON, MOYLAN and GILBERT, JJ.

*Arnold M. Zerwitz* and *Geraldine K. Sweeney* for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Sandra O'Connor, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The doctrine of "transferred intent" has long been recognized at common law. Sir Matthew Hale, in 1 *History of the Pleas of the Crown* (published posthumously in 1736), said, at 466:

> "To these may be added the cases abovementioned, *viz.* if A. by malice fore-thought strikes at B. and missing him strikes C. whereof he dies, tho he never bore any malice to C. yet it is murder, and the law transfers the malice to the party slain; the like of poisoning."

Forty years later, Sir William Blackstone, in 4 *Commentaries on the Laws of England,* reiterated the common law rule according to Hale, at 200-201:

> "Thus if one shoots at A. and misses *him,* but kills B., this is murder; because of the previous felonious intent, which the law transfers from one to the other. The same is the case where one lays poison for A.; and B., against whom the prisoner had no malicious intent, takes it, and it kills him; this is likewise murder."

Strangely, that almost universally recognized common

law doctrine has never been squarely before the appellate courts of Maryland until the present appeal of John Michael "Box" Gladden from his convictions of murder in the first degree and of the use of a handgun in the commission of a felony by a Baltimore City jury, presided over by Judge Marshall A. Levin. The worth of the common law doctrine, however, is made well apparent by the tragic and senseless slaying of the innocent 12-year old victim in the case at bar.

Testimony in this case permitted the following findings of fact to be made by the jury. Walter Edward "Rabbi" Siegel had known the appellant, "Box," for several years. The killing occurred on March 12, 1973, at approximately 2:30 p.m. About one week before, "Rabbi" had purchased two "dime bags" of heroin from "Box." "Rabbi" was subsequently disenchanted when the heroin turned out to be of an inferior grade. Three or four days thereafter, "Rabbi" undertook to redeem the situation by self-help. He hunted "Box" down in a bar and robbed him, at gunpoint, of $5 and several bags of drugs. By March 12, therefore, the pendulum of retribution had swung the other way, and it was "Box" who came gunning for "Rabbi."

"Rabbi" was sitting on some front steps in the 2300 block of Barclay Street with a girlfriend and fellow heroin "shooter," Patsy Lou Quickly. Miss Quickly first noticed the approach of "Box" and sounded the alarm. She interposed herself between the two men, importuning, "Don't kill him, don't kill him, I'll give you mine." Those few seconds of breathing space gave "Rabbi" the opportunity to duck behind a truck. "Box" took up the pursuit. "Box" chased "Rabbi" several times around the truck, wildly firing off four or five shots. When the gun emptied, "Rabbi" got away unscathed. Several witnesses observed the whole affray. One noticed that one of the bullets went through a window, one hit a window sill and the other two bullets struck nearby houses. Another witness noticed that children were in the area, school having just adjourned.

Kenneth Nixon, age 16, and William Jeffrey Nixon, age 12, were in their home at 2325 Barclay Street, when at 2:30 p.m. they heard excitement outside. Jeffrey Nixon was

seated on the living room couch. Kenneth Nixon went to a window and observed "Box," whom he identified, and another man running around. He heard three shots. He then saw his brother jump up from the couch, claiming he had been shot. Jeffrey ran upstairs. Kenneth followed and found his brother lying on the floor. The autopsy revealed that a .45 caliber bullet had pierced his heart and both lungs.

The appellant contends that he should not have been convicted of murder, since he bore no malice toward the victim. He urges upon us that the common law doctrine of "transferred intent" should not be received into Maryland, although he acknowledges that this is the law in the overwhelming majority of common law jurisdictions. We have no difficulty in deciding that "transferred intent" is, and should be, a part of the common law of this State.

The state of the law is too clear to permit of doubt. Hochheimer, *Crimes and Criminal Procedure* (2d Ed., 1904), says, at 374:

> "Upon principles heretofore stated, criminal liability attaches, if homicide is caused in any of the following ways:
>
> 1. By an act designed to take human life, tho no injury to the person actually killed was contemplated, as where a blow aimed at one person lights upon and kills another . . ."

Clark and Marshall, *A Treatise on the Law of Crimes* (6th, Wingersky Ed., 1958), says, at 578:

> "Whenever an accountable man kills another intentionally, he is guilty of murder with express malice unless the killing is justifiable or excusable, or unless there are such circumstances of provocation as will reduce the homicide to manslaughter. This principle is applied when a man kills one person when he intended to kill another. For example, if a man shoots at one person with intent to kill him, and unintentionally kills another, or sets poison for one person and another drinks it

and dies, it is murder with express malice of the person killed, though he is a friend."

A somewhat fuller exposition is found at 40 Am.Jur.2d, *Homicide*, § 11, "Intention to take life — of one other than deceased," 302-303:

"The fact that the homicidal act was directed against or intended to effect the death of one other than the person killed does not relieve the slayer of criminal responsibility. With the exception of a very few courts which, in interpreting local statutes, hold that the malice necessary to constitute murder in the first degree does not exist when a homicide is actually committed upon one person by a blow aimed at another, it is generally agreed that such a homicide partakes of the quality of the original act, so that the guilt of the perpetrator of the crime is exactly what it would have been had the blow fallen upon the intended victim instead of the bystander. Under this rule, the fact that the bystander was killed instead of the victim becomes immaterial, and the only question at issue is what would have been the degree of guilt if the result intended had been accomplished. The intent is transferred to the person whose death has been caused, or as sometimes expressed, the malice or intent follows the bullet."

To a similar effect, see 1 *Wharton's Criminal Law and Procedure* (Anderson Ed., 1957), at 438-441. Also see Annotation, "Homicide by unlawful act aimed at another," 18 A.L.R. 917 (1922). For a fuller treatment of the development of this body of law, and for an analysis thereof, see Ritz, *Felony Murder, Transferred Intent, and the Palsgraf Doctrine in the Criminal Law*, 16 Wash. & Lee L. Rev. 169 (1959).

Although Maryland has never ruled on the point, there have been at least intimations. *Jones v. State*, 188 Md. 263, 52 A. 2d 484, dealt with a first-degree murder conviction

where the murderer intended to kill the man whom he shot but where the murderer entertained the mistaken belief that the shooting victim was someone else. Although the conviction was sustained, the point was dealt with only in passing and, even then, on the ground that the Court, as of 1947, would not pass upon the sufficiency of the evidence. It said, at 188 Md. 272-273:

> "Finally, we reject appellant's contention that the verdict of murder in the first degree was unwarranted because the State did not prove premeditation. He argues that, even though his confession is admissible, he said in that confession that he thought he was shooting Gene Taylor, and as he had no reason to kill Graham, he had insufficient time for deliberation. The Constitution of Maryland, art. 15, sec. 5, provides that in the trial of every criminal case the jury shall be the judges of law as well as of fact. The Court of Appeals has always refused to pass upon the sufficiency of evidence to establish the commission of a crime with which a defendant has been charged. Where there is no reversible error in the rulings of the trial court, the verdict and judgment must stand."

A dictum in *Ruffin v. State*, 10 Md. App. 102, 268 A. 2d 494, deals arguably with a converse of our present situation, although it, to be sure, never spoke of the "transferred intent" doctrine as such. The defendant there was warding off several attackers. He fired several shots, not aimed at his attackers, and inadvertently wounded an innocent bystander. The lower court returned a verdict of not guilty of assault with intent to murder but guilty of simple assault on the wounded bystander. We offered the thought, at 10 Md. App. 105:

> "Appellant was found not guilty of assault with intent to murder but guilty of common law assault upon Hattie Louise Johnson, an innocent bystander. While we are not called upon to decide

the question, we are of the opinion that the lower court was correct in finding the appellant not guilty of assault with intent to murder. It is apparent from the evidence that there was no specific intent to inflict great bodily harm upon either Shorty or his companion, in that the firing of the revolver was directed some 10 to 12 feet to the right of them as they approached the appellant. The shots were fired as a warning not to come closer, after which the appellant fled.

The lower court apparently based its finding of not guilty of assault with intent to murder upon a finding that appellant fired the shots in an effort to deter Shorty and his friend from attacking him."

We now hold that the doctrine of "transferred intent" is the law of Maryland and that whatever *mens rea* a defendant entertains as to his intended target will carry over to any unintended victim, when the attack goes wide of its mark.

The appellant raises a second contention that Judge Levin was unfair and prejudicial in his questioning of State's witness Walter "Rabbi" Siegel and of defense witness Charles Logan. We have thoroughly reviewed the transcript and find no abuse whatsoever of the judge's discretion. As to Siegel, the judge sought to bring out certain facts that had not been fully developed by the State or by the defense. When the testimony of Logan was evasive and equivocal, the judge appropriately sought clarification. His questioning was clearly in furtherance of the search for truth, which is the ultimate end and reason for being of the trial process. There was no abuse.

*Judgments affirmed.*