681 A.2d 628

**Latrice Michelle HARVEY**

v.

**STATE of Maryland.**

**No. 1763, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Aug. 30, 1996.

402

Michael R. Malloy, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

Mary Ann Ince, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Jack B. Johnson, State's Atty. for Prince George's County of Upper Marlboro, on the brief), for Appellee.

Submitted before WILNER, C.J., and MOYLAN and SALMON, JJ.

MOYLAN, Judge.

The subject of this appeal is the doctrine of transferred intent. The particular question is whether that doctrine, indisputably applicable when an unintended victim is killed and the crime charged is a consummated homicide, is similarly applicable when the unintended victim is not killed (either hit but only wounded or not even hit but only endangered) and the arguable crime, even with the benefit of the doctrine, would only be an inchoate criminal homicide, such as 1) assault with intent to murder, 2) attempted murder (in either degree), or 3) attempted voluntary manslaughter.

The appellant, Latrice Michelle Harvey, was convicted by a Prince George's County jury of assault with intent to murder and reckless endangerment. On this appeal, she raises three contentions:

1) That the trial judge erroneously instructed the jury on the subject of transferred intent;

2) That the trial judge erroneously failed to merge the conviction for reckless endangerment into the conviction for assault with intent to murder; and

3) That the evidence was not legally sufficient to sustain the conviction for assault with intent to murder.

### The Facts

At approximately 10:30 P.M. on June 14, 1994, at an apartment complex at 1107 Nalley Road in Landover, Prince

George's County, a gunfight occurred. An innocent bystander, Tiffany Evans, was shot in the leg and taken to a hospital. For purposes of further analysis, Tiffany Evans is the "unintended victim" or "unintended target." The appellant, informally known to everyone in the neighborhood as "Kitty Cat," was not the shooter. The shooter was Kitty Cat's male companion. The trouble started with a fight on the parking lot between two groups of young men. The leading combatant on one side was a young man named Antoine. The leading combatant on the other side was Kitty Cat's brother. It was while that fight was in progress that Kitty Cat and the ultimate shooter approached the scene of the confrontation.

The gun that was ultimately fired was passed, wrapped in a white towel, by an unidentified male to Kitty Cat. She then passed it, in turn, to her companion, who did the actual shooting. As Kitty Cat passed the gun to the shooter, she pointed to one young man in the crowd and told her companion, "Shoot him." One witness also heard Kitty Cat say that "she wanted him dead." The male companion, on her command, started shooting but missed the intended target, who turned and ran away. The shooter did not give chase. Approximately five shots had been fired. Kitty Cat then tapped her companion and caught his attention again. She pointed at another target and, again at her direction, her companion fired approximately four additional shots. That second intended target was standing in close proximity to Tiffany Evans. The four shots missed their intended target, but one of the errant bullets hit Tiffany Evans in the leg.

### The Jury Instruction

Over the appellant's objection, the trial judge gave the following instruction on the subject of transferred intent:

> In this case there are two legal theories that are applicable, and those are the theory of aiding and abetting another, and . . . something we call transferred intent. . . .

\*   \*   \*   \*   \*   \*

The doctrine of transferred intent means that the intent follows the bullet. The intent is—I think there was one witness that said that the bullet didn't have any name on it or whose name is on the bullet. Well, the transfer of intent means that the intent follows wherever the bullet goes.

During the course of its deliberations, the jury sent out a note asking for a further explanation of transferred intent. Again over the appellant's objection, the trial judge gave the following supplemental instruction:

All right. Ladies and gentlemen of the jury, the doctrine of transferred intent is not a very common thing that juries have to deal with. I have borrowed an instruction from another judge, which I hope will be helpful to you.

The doctrine of transferred intent applies to the specific intent to murder. Transferred intent means that if one specifically intends injury to another person, and in an effort to accomplish the injury or harm upon a person other than the one intended, he is guilty of the same kind of crime as if his aim had been more accurate.

The fact that a person actually was killed instead of the intended victim, is immaterial, and the only question is what would have been the degree of guilt, if the result intended actually had been accomplished. The intent is transferred to the person whose death or harm has been caused.

The appellant's primary contention is that the doctrine of transferred intent is inapplicable to the crime of assault with intent to murder and erroneously relieved the State of its obligation to prove the required *mens rea* of a specific intent to kill directed at the actual assault victim, Tiffany Evans.

### Whose Intent Is Being Transferred?

Before turning to the ultimate question of the applicability of the transferred intent doctrine to a charge of inchoate criminal homicide, one modest procedural complication must be acknowledged and dealt with. With regard to the shooting of Tiffany Evans, the appellant, of course, was not the principal in the first degree. That role was played by the appel-

lant's male companion, the actual triggerman. The appellant was merely a principal in the second degree, present at the scene and actively aiding and abetting the first-degree principal in his criminal conduct but not herself wielding the gun. To what extent, therefore, does the appellant, as a second-degree principal, partake of the guilt of the first-degree principal and to what extent must she generate her own guilt? That depends on which particular element of the larger crime is being examined.

With respect to the *actus reus*—the physical battery of Tiffany Evans—the appellant bears full responsibility for whatever her companion did. The shooter committed a criminal act regardless of whether his marksmanship was good or bad, and the appellant shared full responsibility for the criminal act itself. She was responsible for the consequences of his bad aim as surely as she would have been responsible for the consequences of his good aim. The *actus reus* of the first-degree principal is attributable to all parties to the crime.

Although we are in this case dealing with an inchoate criminal homicide rather than a consummated criminal homicide, the law that has been developed in the consummated homicide context, as to which elements of a crime are shared by all multiple defendants alike and which elements must be established independently as to each defendant individually, is instructive in this context as well. All participants in a crime—the various aiders, abettors, and inciters, the principals in the second degree and the accessories before the fact—are tied into the criminal act itself, to wit, into a common and collective *actus reus*.

If, therefore, the level or degree of guilt for a criminal homicide is controlled by the *actus reus*, then the guilt level of all participants must rise or fall together. If the homicide occurred in the perpetration or attempted perpetration of a felony spelled out in Md.Code Ann., Art. 27, §§ 408, 409, or 410, for instance, all parties to the crime would be guilty of felony-murder in the first degree. Their individual intents would be immaterial, provided only that they had the neces-

sary intent to commit the underlying felony. If the felony should be one of the residual felonies under the common law felony-murder doctrine and not one of those listed in sections 408, 409, or 410, the guilt of all participants would then be murder in the second degree, under the common law felony-murder doctrine. If the crime being perpetrated were a misdemeanor and death resulted, all participants would be guilty of manslaughter under the common law misdemeanor-manslaughter doctrine. It is, with respect to those particular crimes, the collective act to which all defendants are tied that controls the level of guilt.

■ When the degree of aggravation or level of blameworthiness of a crime, however, is not automatically a function of the criminal act itself but depends, rather, on the additional presence of some special mental element or specific intent—in this case the specific intent to kill that could elevate a simple assault and battery into an assault *with intent to murder*—each co-participant in the crime is on his own as to that mental element. The *mens rea* of each participant is independent of that of all other participants. It is the unique *mens rea* of each defendant that controls the level of guilt of that defendant. An aider and abettor or an accessory before the fact may be more blameworthy than the principal in the first degree or equally blameworthy or less blameworthy. Each *mens rea* floats free.

In *State v. Ward*, 284 Md. 189, 201, 396 A.2d 1041 (1978), Judge Orth noted in this regard:

> Furthermore, a principal in the second degree may be convicted of a higher crime or a lower crime than the principal in the first degree. Clark & Marshall § 8.05, p. 521; Perkins at 670–671.[15]

---

15. Perkins gives examples. "[The principal in the second degree] may be convicted of first-degree murder, for example, although the [principal in the first degree] has been convicted of second-degree murder. Similarly, the former may be convicted of murder although the latter has been convicted of manslaughter, since an abettor may

counsel with malice aforethought what the other perpetrates in the sudden heat of passion. An abettor may be convicted of felony even though the perpetrator has been convicted of misdemeanor only. Needless to say, the abettor may be convicted of a lower degree of crime than the perpetrator." *Id.* at 671 (footnotes omitted).

Although, as *State v. Ward* noted, the guilt levels of principals in the first and second degrees could rise and fall independently of each other, the common law was far more rigid in the case of accessories before the fact. At the common law, an accessory before the fact could not be found guilty, either in terms of the crime or the degree of a crime, at a higher level of blameworthiness than could the principal in the first degree. The Court of Appeals abrogated that limitation in *Jones v. State,* 302 Md. 153, 486 A.2d 184 (1985), and held that the guilt level of an accessory before the fact could be determined exclusively by the *mens rea* of that accessory and was not in any way dependent on the guilt level of the principal in the first degree. Judge Eldridge wrote for the Court, 302 Md. at 161, 486 A.2d 184:

Merely because the evidence in the principal's trial may have been different, or the principal may have agreed to a favorable plea bargain arrangement, or the jury in the principal's trial may have arrived at a compromise verdict, is not a good reason for allowing the accessory to escape the consequences of having committed a particular offense....

Consequently, with respect to cases where the trials of accused accessories before the fact commence after the date of our opinion in the present case, an accessory before the fact may be convicted of a greater crime or greater degree of crime than that of which his principal was convicted. (Citations omitted).

The question of differing levels of guilt arose squarely as the critical issue for decision in *Oates v. State,* 97 Md.App. 180, 181, 627 A.2d 555 (1993):

The single question raised by this appeal is simple. When two defendants are jointly convicted of perpetrating a criminal homicide, must their levels of guilt (blameworthiness) be the same? The answer is equally simple: No.

The death of one Patrick Stanford was a criminal homicide. Both the appellant Oates and a codefendant named Giles jointly participated in that criminal homicide. Giles, the prin-

cipal in the first degree, was found to be guilty of murder, of the specific-intent-to-kill variety, in the second degree:

> [T]he jury obviously concluded that Giles was a principal in the first degree, the wielder of the weapon that struck the fatal blows. From the multiplicity of potentially fatal blows, moreover, the jury concluded that Giles attacked Stanford with a specific intent to kill. The jury gave Giles the benefit of the doubt, however, when it concluded that that specific intent to kill was not premeditated. The obvious verdict under the circumstances was that Giles was guilty of murder in the second degree.

97 Md.App. at 183, 627 A.2d 555. The appellant Oates, however, albeit indisputably guilty of participation in the lethal act, did not share the *mens rea* of a specific intent to kill, either premeditated or unpremeditated. His *mens rea* was both of a different kind and at a different level of blameworthiness:

> It is equally clear that the jury concluded, with abundant support in the evidence, that the appellant jointly participated with Giles in the criminal homicide. The jury obviously concluded that the appellant was a principal in the second degree, not wielding the lethal weapon but actively aiding and abetting the man who did. Perhaps crediting the exculpatory testimony of the appellant or at least entertaining some doubt thereby, the jury did not conclude that the appellant attacked Stanford with a specific intent to kill or even a specific intent to do grievous bodily harm. Giving the appellant a significant benefit of the doubt, it concluded simply that the appellant was guilty of either 1) grossly negligent, life-endangering conduct toward Stanford or 2) the perpetration of an unlawful act (assault and battery) upon Stanford that resulted in Stanford's death. Either of those closely related states of mind would render the appellant guilty of involuntary manslaughter. That was the verdict the jury returned as to the appellant.

97 Md.App. at 184, 627 A.2d 555.

Oates claimed that the two verdicts were "legally inconsistent" and that he could not be guilty of "aiding and abetting

the crime of grossly negligent involuntary manslaughter" when the verdict with respect to the first-degree principal had been for an intentional murder in the second degree. In rejecting that contention, we reasoned, 97 Md.App. at 185, 627 A.2d 555:

The appellant betrays a lack of appreciation of the complex matrix of blameworthiness arising out of a single criminal homicide. The appellant was not in this case an aider and abettor to involuntary manslaughter any more than he was an aider and abettor to second-degree murder or an aider and abettor to first-degree murder. He was, purely and simply, *an aider and abettor to criminal homicide, that and nothing more.* When two or more persons are joint participants in a crime, they are joint participants only with respect to a single and common *actus reus.* Where, however, a single criminal act has different levels of blameworthiness contingent upon the particular *mens rea* with which it is perpetrated, multiple participants in that crime do not necessarily share the same *mens rea.* Although joint participation ultimately depends upon a mutual tie to the same criminal act, the individual *mentes reae* or levels of guilt of the joint participants are permitted to float free and are not tied to each other in any way. If their *mentes reae* are different, their independent levels of guilt, reflected by nondependent verdicts, will necessarily be different as well. (Emphasis supplied).

This Court went on to observe that with respect to criminal homicide, "there is a single guilty act but a rich smorgasbord of guilty minds from which to choose." 97 Md.App. at 185–86, 627 A.2d 555. The opinion then gave examples, 97 Md.App. at 187, 627 A.2d 555, of the varied menus that such smorgasbords might present:

The *mens rea* or level of blameworthiness of a principal in the first degree by no means controls the *mens rea* or level of blameworthiness of a principal in the second degree or of an accessory before the fact. If three codefendants burst into a motel room and discover the wife of one of them in an act of adultery, what is the crime if the two adulterers are

then shot and killed? If the triggerman (the principal in the first degree) is the cuckolded husband, the Rule of Provocation may mitigate his guilt downward to the manslaughter level. The accomplice who hands him the gun, however, will be guilty at least of murder in the second degree, notwithstanding the fact that he is aiding and abetting a mere manslayer. If the third codefendant, who led the suspicious husband to the motel room in the first place, knew full well what would there be found and had been scheming for some time thereby to get rid of the adulterous lover, his premeditated intent to kill would raise his guilt to the first degree notwithstanding the guilt of his fellow participants at lower levels. Conversely, the principal in the first degree (the triggerman) could have possessed a premeditated intent to kill and his aider and abettor, who handed him the gun in a fit of jealous rage, might be the beneficiary of the Rule of Provocation.

Before we even begin to talk about the propriety of transferring a specific intent to kill from the intended target to the unintended target, therefore, we must determine whose intent we are contemplating transferring—that of the first-degree principal who pulled the trigger or that of the appellant who aided and abetted him. Their respective intents may coincidentally have been the same, but they were not necessarily so.

■ At the trial of the aider and abettor, Kitty Cat, the particular *mens rea* of the triggerman, even assuming he had one, is a matter of blithe unconcern to us. Once the triggerman committed the *actus reus* which the appellant aided and abetted, the triggerman can be conveniently factored out of the equation. To be guilty, even as a principal in the second degree, of assault with intent to murder, it is the appellant herself who must have entertained, as she aided and abetted, the specific intent to kill the second intended target. That is the *sine qua non* before we even consider the propriety of transferring that specific intent to kill from the intended target to the unintended victim, Tiffany Evans. Self-evident-

ly, that which does not exist in the first instance cannot be transferred.

██ In this case, however, the evidence was legally sufficient to permit a finding that the appellant specifically intended to kill the two targets toward whom she directed her companion's fire. If directing a deadly weapon at a vital part of the human anatomy can give rise to a permitted inference of an intent to kill, which it most assuredly can, then, by parity of reasoning, aiding and abetting the directing of a deadly weapon at a vital part of the human anatomy can give rise to the same permitted inference. There was, moreover, evidence that the appellant, as she directed her companion's fire, had said, "Shoot him" and "I want him dead." The express utterances were, to be sure, with respect to the first intended target, but there was no indication, as she immediately redirected fire at a second intended target, that her deadly purpose had in any way ameliorated.

██ Since there was legally sufficient evidence to show that the appellant harbored a specific intent to kill the second intended target, the stage is set for inquiring into whether that specific intent to kill can be transferred, in the context of an assault with intent to murder trial, from the intended target to the unintended victim, Tiffany Evans. The inquiry into whether a doctrine developed to handle special problems in cases of consummated homicide should be extended to cases of inchoate homicide requires us to look at the evolution of the transferred intent doctrine generally.

### Transferred Intent Generally

Suppose the intended victim in the cross-hairs of the gunsight is the President of the United States, Franklin Delano Roosevelt. Suppose the assassin's aim is unsure and the unintended recipient of the errant shot is Mayor Anton Cermak of Chicago. What is the guilt of the assassin with respect to Mayor Cermak, to whom the assassin bore no ill-will nor ever intended any harm? We encounter the issue of trans-

ferred intent, whereunder it is sometimes said that the intent follows the bullet.

As we attempt to follow the badly aimed or otherwise errant bullet that misses or is deflected from A (the intended target) and then hits or comes perilously close to B (the unintended target), a matrix of no less than nine combinations of criminal harms or *acti rei* presents itself. On the vertical axis, the intended target may have been 1) aimed at but missed, 2) hit but only wounded, or 3) hit and killed. With respect to each of those possibilities, there are then three further possibilities on the horizontal axis. Those are where the unintended target may have been 1) hit and killed, 2) hit but only wounded, or 3) endangered but missed. Which combinations are appropriate subjects for the application of the transferred intent doctrine?

|  | Unintended Target Hit and Killed | Unintended Target Hit But Not Killed | Unintended Target Missed |
|---|---|---|---|
| Intended Target Missed | ? | ? | ? |
| Intended Target Hit But Not Killed | ? | ? | ? |
| Intended Target Hit and Killed | ? | ? | ? |

### When the Intended Victim Is Missed and the Unintended Victim is Killed

The classic transferred intent scenario was that in which lethal force was directed toward an intended victim, missed its target, and killed an unintended victim. That was the context in which the doctrine was hammered out as part of English common law. The doctrine was early recognized at common law. Sir Matthew Hale, in 1 *History of the Pleas of the Crown* (published posthumously in 1736), said, at 466:

To these may be added the cases above-mentioned, *viz.* if A. by malice fore-thought strikes at B. and missing him

strikes C. whereof he dies, tho he never bore any malice to C. yet it is murder, and the law transfers the malice to the party slain; the like of poisoning.

Forty years later, Sir William Blackstone, in 4 *Commentaries on the Laws of England,* reiterated the common law rule according to Hale, at 200–01:

Thus if one shoots at A. and misses *him,* but kills B., this is murder; because of the previous felonious intent, which the law transfers from one to the other. The same is the case where one lays poison for A.; and B., against whom the prisoner had no malicious intent, takes it, and it kills him; this is likewise murder.

Strangely, that almost universally recognized common law doctrine of transferred intent had never been squarely before the appellate courts of Maryland until it came before the Court of Special Appeals in *Gladden v. State,* 20 Md.App. 492, 316 A.2d 319, *aff'd* 273 Md. 383, 330 A.2d 176 (1974). The killer, John Michael "Box" Gladden, was involved in a dispute with Walter Edward "Rabbi" Siegel over the sale of $20 worth of heroin of an allegedly inferior grade. As "Box" chased "Rabbi" several times around a truck in the 2300 block of Barclay Street in Baltimore, he wildly fired off four or five shots from a .45 caliber revolver. None of the shots hit "Rabbi," who got away unscathed. Of the wild shots, however, one went through a nearby window, one hit a window sill, and two others struck nearby houses. A twelve-year-old boy was seated on his living room couch at 2325 Barclay Street when a .45 caliber bullet fatally pierced his heart and both lungs. 20 Md.App. at 494–95, 316 A.2d 319.

Gladden contended, on appeal, that he should not have been convicted of first-degree murder because he bore no malice toward the unintended victim. He argued that the common law doctrine of "transferred intent" should not be received into Maryland, although he acknowledged that it was the law in the overwhelming majority of common law jurisdictions. This Court, 20 Md.App. at 495, 316 A.2d 319, had "no difficulty in deciding that 'transferred intent' is, and should be, a part of

the common law of this State." After analyzing at length the various treatises and authorities, the Court concluded:

> We now hold that the doctrine of "transferred intent" is the law of Maryland and that whatever *mens rea* a defendant entertains as to his intended target will carry over to any unintended victim, when the attack goes wide of its mark.

20 Md.App. at 498, 316 A.2d 319.

In *Gladden v. State,* 273 Md. 383, 330 A.2d 176 (1974), the Court of Appeals affirmed the decision of this Court. In the very thoroughly researched opinion of Judge O'Donnell, it then supplemented the review of common law authorities by reference to several of the early English cases, 273 Md. at 390–91, 330 A.2d 176. The Court of Appeals specifically rejected Gladden's contention that the "transferred intent" doctrine was unworthy of incorporation into Maryland because it was a "curious survival of the antique law":

> Although admittedly the doctrine is of "ancient vintage," we do not agree with the petitioner's contention that under modern statutory classifications it is a "curious survival of the antique law" requiring its rejection. It has lost none of its patina by its application over the centuries down unto modern times; its viability is recognized by its current acceptance and application. (Footnote omitted).

273 Md. at 392, 330 A.2d 176. Judge O'Donnell then engaged in a definitive survey, 273 Md. at 392–403, 330 A.2d 176, of the case law throughout the United States accepting the doctrine of "transferred intent."

In analyzing the development of the "transferred intent" doctrine at the common law, *Evans v. State,* 28 Md.App. 640, 687–88, 349 A.2d 300 (1975), *aff'd* 278 Md. 197, 362 A.2d 629 (1976), pointed out that although the notion that the intent "transferred" from one victim to another was, in effect, a legal fiction in the course of the law's development, the doctrine today is eminently sound in application:

> In earlier evolutionary stages, a legal fiction or a procedural device may have been at work. It is now clearly recognized,

however, that what is involved is simply a rule of substantive law that the *mens rea* of murder as to anyone coupled with the *actus reus* of a homicide is sufficient to constitute the crime of murder. As long as the *mens rea* and the *actus reus* correspond in time, there is no requirement that the *mens rea* be directed specifically at the actual victim. The modern and better explanations of the doctrine point out the inappropriateness of the word "transferred" in the earlier case law.

Perkins, *Criminal Law* (2d [e]d. 1969) makes it plain that to speak of "transferring the malice" was simply "to offer an unsound explanation ... to support a very sound conclusion," saying at 826:

"If, without justification, excuse or mitigation, D with intent to kill A fires a shot which misses A but unexpectedly causes the death of B, D is guilty of murder. To speak of transferring the malice from A to B is merely to offer an unsound explanation (carried over from the law of torts) to support a very sound conclusion. The proper explanation is that D is guilty of murder in such a case because all elements of the offense are present, with mention if it seems necessary of the fact that as a crime the wrong was committed against the state. An intent to commit homicide without justification, excuse or mitigation, is malice aforethought; D had such an intent and therefore had malice aforethought; and an act done by D with this malice aforethought caused the death of another—and hence D has committed homicide with malice aforethought, which is murder by definition."

To a similar effect is LaFave and Scott, *Criminal Law* (1972), at 253, pointing out that the right result is reached but that the earlier "sort of reasoning is, of course, pure fiction":

These proper conclusions of law as to criminal liability in the bad-aim situation are sometimes said to rest upon the ground of "transferred intent" ... This sort of reasoning is, of course, pure fiction. A never really intended to harm C; but it is not necessary, in order to impose criminal liability upon A, to pretend that he did. What is really meant, by

this round-about method of explanation, is that when one person (A) acts (or omits to act) with intent to harm another person (B), but because of a bad aim he harms a third person (C) whom he did not intend to harm, the law considers him (as it ought) just as guilty as if he had actually harmed the intended victim. In other words, criminal homicide, battery, arson and malicious mischief do not require that the defendant cause harm to the intended victim; an unintended victim will do just as well. (footnotes omitted).

In that classic scenario, one corner of the matrix was readily filled in:

| | Unintended Target Hit and Killed | Unintended Target Hit But Not Killed | Unintended Target Missed |
|---|---|---|---|
| Intended Target Missed | TRANSFERRED INTENT | ? | ? |
| Intended Target Hit But Not Killed | ? | ? | ? |
| Intended Target Hit and Killed | ? | ? | ? |

### The Conceptual Problem

Some of the early, and simplistic, explanations of the transferred intent doctrine gave rise to some troubling conceptual problems. The classic formulation envisioned a single *actus reus*—the death of the unintended victim. If the single *mens rea*—the specific intent to kill the intended victim, *e.g.*—could then be "transferred" to the unintended victim, the unitary *mens rea* could combine with the unitary *actus reus* to produce one unitary and doctrinally tidy crime. *Q.E.D.*

The simple arithmetic explanation proved inadequate, however, when there was more than one *actus reus*. Suppose, in addition to the death of the unintended victim, the intended victim had also been killed or, at least, wounded by the bullet in its flight. If the *mens rea* had to be used to prove the

crime against the intended victim, what was then left to be "transferred" to the case involving the unintended victim? The conceptual problem also arose even where the deadly force missed the intended victim completely but the State nonetheless sought to charge the assailant with the inchoate crime of attempted murder or assault with intent to murder. If the *mens rea* were in limited supply, to which of two crimes should it be allocated? How could a single *mens rea* be made to do double duty? It may now seem silly but this sort of anguishing was, in the course of the law's development, a doctrinal stumbling block.

The limiting factor in such analysis was that, subconsciously, it assumed that it must apply the same arithmetic to the *mens rea* that it applied to the *actus reus*. It thereby created unnecessary but perplexing problems. If the *mens rea* has been transferred to the unintended *actus reus*, it is asked, how then could it still be available for an inchoate crime involving the intended *actus reus?* If it had been transferred somewhere else, how could it still be available here? Conversely, if we had used up the *mens rea* by combining it with the intended *actus reus* to make one complete inchoate crime such as attempted murder, had we not then exhausted its utility so that there was nothing left to be transferred to the unintended *actus reus?* If it has been used here, how can it still be available to be sent elsewhere?

■ By thinking of the *mens rea* in such finite terms—as some discrete unit that must be either here or there—we have created a linguistic problem for ourselves where no real-life problem existed. Criminal *acts*, consummated or inchoate, are discrete events that can be both pinpointed and counted. A *mens rea*, by contrast, is an elastic thing of unlimited supply. It neither follows nor fails to follow the bullet. It does not go anywhere. It remains in the brain of the criminal actor and never moves. It may combine with a single *actus reus* to make a single crime. It may as readily combine with a hundred *acti rei*, intended and unintended, to make a hundred crimes, consummated and inchoate. Unforeseen circum-

stances may multiply the criminal acts for which the criminal agent is responsible. A single state of mind, however, will control the fact of guilt and the level of guilt of them all.

### The Fate of the Intended Victim Is Immaterial

The transferred intent doctrine assumed greater utility once we began to free ourselves from some of the constraints that were the unintended consequences of its metaphorically inapt label. Once we stopped conceptualizing a defendant's *mens rea* as a single finite unit that might be "transferred" from one *actus reus* to another, we were free to view it as a pervasive state of moral fault or criminal purpose, of unlimited supply, that could influence any number of expected or unexpected consequences that might flow from it. The arithmetic problem was finessed, and the guilt of the assailant (or his accomplice) *vis-a-vis* the unintended victim was unaffected by the fate of the intended victim. As far as the case with respect to the unintended victim was concerned, it made no difference whether the intended victim had been 1) aimed at and missed, 2) hit but only wounded, or 3) hit and killed. It similarly made no difference whether the assailant (and/or accomplice) had been charged with a crime against the intended victim or not. There was no danger of depleting the *mens rea*.

The "transferred" *mens rea vis-a-vis* the unintended victim or victims will not be affected in any way, therefore, by what happens to the intended victim. If B is hit or endangered by a bullet aimed at A, whatever crime may have occurred with respect to B is a constant regardless of whether A is missed, injured, or killed. It follows that it does not matter whether the bullet that hit or endangered B missed A completely or passed through A on its way toward B. In the latter case, moreover, it does not matter whether the bullet passing through A's body killed him or only wounded him. It will be of critical legal significance, however, whether B, the unintended victim, is 1) endangered but not hit, 2) hit and killed, or 3) hit but only wounded. What happens to the intended target does not matter. It is what happens to the unintended but actual victim that controls our analysis.

*Poe v. State,* 341 Md. 523, 671 A.2d 501 (1996), was a departure from the earlier and more familiar scenario in which the intended target was aimed at but missed. In *Poe* the shotgun blast aimed at the intended victim actually hit and wounded her. With respect to that intended victim, moreover, Poe was found guilty of attempted murder in the first degree. A 50 caliber lead slug, however, passed through the intended victim's arm, hitting and killing an unintended victim, a six-year-old girl. Poe contended that because of his conviction for the attempted murder of the intended victim, "he 'used up' all of his intent on ... his targeted victim" and that there was, therefore, "no intent left to transfer to ... the unintended victim." 341 Md. at 528, 671 A.2d 501.

The Court of Appeals observed that the fact that the deadly blast hit rather than missed the intended victim did not affect the application of the law in any way. Judge Chasanow explained:

> We agree with the State that the passing of the bullet through the arm of the intended victim before killing the unintended victim does not alter or negate the application of the doctrine of transferred intent. *A fortiori,* this is a classic case of transferred intent.

341 Md. at 528–29, 671 A.2d 501.

The Court's conclusion was clear that Poe's level of blameworthiness for his unquestioned killing of the unintended victim was not in any way affected or diminished by the fact that the shotgun blast hit rather than missed the intended victim on its way to the unintended victim:

> Mr. Poe asserts that his intent to murder cannot be transferred when the shot *hits* the intended victim and also kills an unintended victim. Mr. Poe's interpretation of the application of transferred intent is too narrow. We hold that transferred intent applies to the death of Kimberly notwithstanding the fact that Mr. Poe actually hit and wounded Ms. Poe. The relevant inquiry in determining the applicability of transferred intent is limited to what could the defendant have been convicted of had he accomplished his intended

act? Since Mr. Poe could have been convicted of first degree murder of Ms. Poe had she died, it was proper for the trial court to instruct the jury on the doctrine of transferred intent for the killing of Kimberly. (Footnotes and citation omitted).

341 Md. at 530–31, 671 A.2d 501.

Although there is yet no Maryland case dealing with one additional set of facts, there is no doubt that the guilt of the defendant for the death of the unintended victim would be precisely the same in the *Poe* scenario, regardless of whether the intended victim 1) was hit and only wounded or 2) was hit and killed. The *actus reus* perpetrated on the unintended victim would have been precisely the same. The *mens rea* or malevolent state of mind of Poe, not subject to being "used up" or exhausted, would then have established the kind and level of blameworthiness for that unintended homicide.

■ Thus, the doctrine of transferred intent operates with full force whenever the unintended victim is hit and killed. It makes no difference whether the intended victim is 1) missed, 2) hit and killed, or 3) hit and only wounded. It makes no difference whether the defendant is charged with a crime against the intended victim or not. The entire left-hand column of the matrix is now complete:

|  | Unintended Target Hit and Killed | Unintended Target Hit But Not Killed | Unintended Target Missed |
|---|---|---|---|
| Intended Target Missed | TRANSFERRED INTENT | ? | ? |
| Intended Target Hit But Not Killed | TRANSFERRED INTENT | ? | ? |
| Intended Target Hit and Killed | TRANSFERRED INTENT | ? | ? |

### When the Unintended Victim Is Neither Killed Nor Injured

The business of "transferring" the *mens rea* of a specific intent to kill from an intended victim to an unintended victim

(or, more properly, simply applying it to the unintended victim) becomes far more complex when dealing with inchoate criminal homicides such as assault with intent to murder, attempted murder (in either degree), and attempted voluntary manslaughter. The complexity is illustrated by the approach initially taken by the Court of Appeals in *State v. Wilson*, 313 Md. 600, 546 A.2d 1041 (1988); a correction of course by a fragmented Court of Appeals in *Ford v. State*, 330 Md. 682, 625 A.2d 984 (1993); and a revisiting of that correction of course by a similarly fragmented Court of Appeals in *Poe v. State*, 341 Md. 523, 671 A.2d 501 (1996).

■ Before turning to that division on the Court of Appeals, however, there is one proposition on which everyone agrees. When what is being considered is a charge of inchoate homicide—attempted murder, attempted voluntary manslaughter, or assault with intent to murder [1]—and the unintended victim has *not* been hit or injured in any way, there will be *no* "transfer" of intent from the intended victim to the unintended victim. The pioneering analysis in this regard was done by Judge Alpert in *Harrod v. State*, 65 Md.App. 128, 499 A.2d 959 (1985). The defendant, throwing a hammer, missed his intended victim and almost hit an infant lying in a nearby port-a-crib. The State urged that the criminal intent aimed at the intended victim should be transferred to the threat posed to the unintended victim. After reviewing generally the law of transferred intent, Judge Alpert pointed out that all of the cases surveyed by *Gladden v. State*, 273 Md. 383, 330 A.2d 176 (1974), were cases in which the unintended victim had actually been injured:

> In every case cited in *Gladden*, the third party to whom the intent was "transferred" was in fact injured. The Court of Appeals expressly held that, under the doctrine, "the *mens*

---

1. It is self-evident that what is true of the inchoate criminal homicide of attempted murder is equally true of the essentially indistinguishable inchoate criminal homicide of assault with intent to murder. *See Ford v. State*, 330 Md. 682, 714 n. 13, 625 A.2d 984 (1993). *See also State v. Wilson*, 313 Md. 600, 607 n. 4, 546 A.2d 1041 (1988).

*rea* of a defendant as to his intended victim will carry over and affix his culpability *when such criminal conduct causes the death of an unintended victim."*

65 Md.App. at 136, 499 A.2d 959. This Court then held squarely that when there is no harm to the unintended victim, the doctrine of transferred intent is inapplicable:

To extend the doctrine of transferred intent to cases where the [un]intended victim is not harmed would be untenable. The absurd result would be to make one criminally culpable for each unintended victim who, although in harm's way, was in fact not harmed by a missed attempt towards a specific person. We refuse, therefore, to extend the doctrine of transferred intent to cases where a third person is not in fact harmed.

65 Md.App. at 137, 499 A.2d 959.

For that proposition established by *Harrod,* there seems to be unanimous approval by the Court of Appeals. In both *State v. Wilson* and *Poe v. State,* the four-judge majority, speaking through Judge Chasanow, took the broad position that the transferred intent doctrine should not apply to any inchoate homicide, whether the unintended victim was hit or not. The three-judge minority, speaking through Judge Raker in *Poe v. State,* was not disposed to withhold the transferred intent doctrine in cases when the unintended victim had actually been injured. Even that concurring opinion agreed, however, that the doctrine would not apply when the victim was not actually hit. Judge Raker's concurring opinion said in this regard:

Reading the language in *Ford* together with our holding in *Wilson,* I believe the correct interpretation is that transferred intent should not apply to attempted murder *if no one is injured. See Harrod v. State,* 65 Md.App. 128, 137, 499 A.2d 959, 963 (1985). (Emphasis supplied).

341 Md. at 535, 671 A.2d 501.

Thus, the right-hand side of the matrix is also filled in:

| | Unintended Target Hit and Killed | Unintended Target Hit But Not Killed | Unintended Target Missed |
|---|---|---|---|
| Intended Target Missed | TRANSFERRED INTENT | ? | NO TRANSFERRED INTENT |
| Intended Target Hit But Not Killed | TRANSFERRED INTENT | ? | NO TRANSFERRED INTENT |
| Intended Target Hit and Killed | TRANSFERRED INTENT | ? | NO TRANSFERRED INTENT |

### When the Unintended Victim Is Injured But Not Killed

It is the intermediate situation—when the unintended victim is actually hit though not killed—that has divided the Court of Appeals. In *State v. Wilson,* 313 Md. 600, 546 A.2d 1041 (1988), the two defendants fired four or five shots at a fleeing Marvin Brown, indisputably intending to kill him. They missed Brown, however, and one of the errant shots hit Juan Kent, an innocent bystander. Kent survived his wound, but suffered paralysis on one side of his body and brain damage that left him unable to walk or to speak. The defendants were convicted of two separate counts of attempted first-degree murder, one with respect to the intended victim, Marvin Brown, and the other with respect to the unintended victim, Juan Kent. 313 Md. at 601–02, 546 A.2d 1041.

Under traditional attempt law, the Court had no difficulty affirming the conviction for the attempted first-degree murder of Marvin Brown. It then affirmed the conviction in the case of Juan Kent on the ground that the actual battery inflicted on him was the *actus reus* and that the murderous *mens rea* intended for Marvin Brown had transferred to Juan Kent. The *Wilson* Court held that "the doctrine of transferred intent applies to the crime of attempted murder and . . . the *mens rea* or specific intent of a defendant as to his intended victim will carry over and determine his culpability when such criminal conduct causes injury to an unintended victim." 313 Md. at 609, 546 A.2d 1041. In earlier *dicta* in the same opinion, the Court had also concluded that its application of the transferred intent doctrine would apply not only to attempted

murder but also to the inchoate crime of assault with intent to murder. 313 Md. at 607 n. 4, 546 A.2d 1041.

Five years after *Wilson,* a four-judge majority in *Ford v. State,* 330 Md. 682, 625 A.2d 984 (1993), in *dicta* to be sure but in extensive and well-considered *dicta,* effected a massive correction of course. It reasoned that the *Wilson* rationale was incorrect and that the transferred intent doctrine should not have been applied by *Wilson* to any of the inchoate homicides such as attempted murder or attempted voluntary manslaughter or assault with intent to murder. Judge Chasanow argued that the transferred intent doctrine is appropriate for a consummated homicide perpetrated on an unintended victim but has no similar applicability in the case of inchoate homicides. The *Ford* majority stated flatly, 330 Md. at 714, 625 A.2d 984:

> We believe *Wilson* should not have applied transferred intent to attempted murder.

(Footnote omitted). In *Poe v. State,* 341 Md. 523, 529, 671 A.2d 501 (1996), the Court of Appeals summarized its earlier statement in *Ford:*

> We stated in *Ford* that transferred intent does not apply to attempted murder. *Id.* (disapproving application of the doctrine of transferred intent to attempted murder in *State v. Wilson,* 313 Md. 600, 546 A.2d 1041 (1988)).... [T]he doctrine of transferred intent does not apply to attempted murder when there is no death.

*Poe* made it clear, 341 Md. at 530, 671 A.2d 501, that when the unintended victim is *not* killed, the transferred intent doctrine will not apply:

> In *Ford,* we made clear that if a defendant intends to kill a specific victim and instead wounds an unintended victim *without killing either,* the defendant can be convicted only of the attempted murder of the *intended* victim and transferred intent does not apply. This is not true where, as in

the case *sub judice,* the defendant intends to murder one victim and instead kills an unintended victim.

(Emphasis in original; footnote and citation omitted).

The concurring opinion of Judge McAuliffe, joined by Judges Rodowsky and Karwacki, took strong exception to the effort to repudiate *Wilson.* There were four votes, however, for the repudiation.[2] The same four-to-three split from *Ford*

---

**2.** Actually, albeit repudiating *Wilson*'s rationale, the *Ford* majority agreed that the *Wilson decision* itself was correct. Judge Chasanow reasoned that multiple convictions could properly be affirmed in a case such as *Wilson* under a theory of concurrent intent. Where a wide-ranging lethal attack is unleashed, even though its primary intended target is a single person in the killing zone or target area, there may be a murderous *mens rea* with respect to all persons who are also coincidentally in the line of fire or "killing zone." In such a case, however, the establishment of a *mens rea* does not involve transferring the murderous intent from the primary target to those standing perilously nearby. It is, rather, the case that there is a concurrent murderous intent directed toward all who are thus in harm's way. Judge Chasanow explained, 330 Md. at 716–17, 625 A.2d 984:

> The intent is concurrent, on the other hand, when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim.

Thus, *Ford* placed its seal of approval on *Wilson*'s affirmance of the double convictions for attempted murder, one against the intended victim and the other against the unintended victim, but the affirmances were for entirely different reasons:

> In essence, we still believe *Wilson* reached the right result, although we no longer adopt its explanation. There was sufficient evidence to support convictions for the attempted murders of both Brown and Kent, but not via transferred intent theory. The sufficiency of the evidence should be based instead on the inference of a concurrent intent to murder the bystander Kent that could be drawn from the multiple shots fired towards both victims.

also resurfaced in *Poe v. State*, with Judge Raker taking up the cudgels laid down by Judge McAuliffe.[3]

We are not bound, of course, by a three-judge dissent nor by the *dicta* of even a four-judge majority. We are persuaded, however, that the majority's bottom-line conclusion is the sounder position. It is, after all, only with respect to *consummated homicide* that the law necessarily must concern itself with a notion like transferred intent. There is a necessity principle at work that is not present when no death has resulted.

In cases involving the actual consummated homicide of an unintended victim, the necessity is that the homicidal agent can only be convicted of the homicide if the law can attribute to him one of the murderous *mentes reae*. It is frequently impossible to do that without resort to the transferred intent doctrine. Unless one strains to bring the death of an unintended victim under the coverage of the common law felony-murder doctrine (the assault with intent to murder the intended victim would, after all, be a felony involving a threat to human life), it might be impossible to convict the homicidal agent for the death he unquestionably caused of the unintended victim.

Even under a common law second-degree felony-murder rationale, one could not get the level of guilt up to the first degree, because assault with intent to murder is not one of those felonies spelled out for such treatment by Art. 27, §§ 408, 409, and 410. Under a felony-murder rationale, moreover, the level of guilt could not be mitigated down to the

---

330 Md. at 718, 625 A.2d 984. Once it is recognized as a viable principle, the applications of the notion of concurrent intent is beautifully simple:

> Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.

330 Md. at 717, 625 A.2d 984.

**3.** Subscribing to Judge Chasanow's position in both *Ford* and *Poe* were Chief Judge Murphy, Judge Eldridge, and Judge Bell.

manslaughter level, even if the defendant shot at the intended target in hot-blooded response to legally adequate provocation. Under the more flexible transferred intent doctrine, by way of contrast, the degree of blameworthiness that is "transferred" could be at any of the three levels. The homicidal agent's bad aim will not make his degree of guilt either lesser or greater than it would have been if his aim had been true.

Similarly, a depraved-heart theory would not be available to the prosecution unless the defendant were aware of the actual or probable presence of the unintended victim within the field of fire and also aware, perhaps, that his aim was bad. In the homicide cases, where the transferred intent doctrine historically developed, it is frequently a choice between that theory of guilt or nothing. In *Poe v. State,* 341 Md. 523, 529, 671 A.2d 501 (1996), Judge Chasanow referred to this necessity principle:

> The obvious purpose behind this doctrine is to prevent a defendant from escaping liability for a murder in which every element has been committed, but there is an unintended victim.

In terms of punishment, moreover, only consummated criminal homicide has that profusion of levels of guilt—normal forms, aggravated forms, mitigated forms—that depend on subtle differences in the *mens rea* of the homicidal agent. The punishment for the unintended homicide will necessarily depend on the type of intent that is "transferred." It could in certain cases be life imprisonment. If the *mens rea* directed toward the intended victim would only have produced murder in the second degree, however, the intent that is transferred will limit the punishment for the unintended death to a maximum of thirty years. If the *mens rea* directed toward the intended victim were mitigated, moreover, the maximum penalty for the unintended death would be limited to ten years. Homicide law needs the transferred intent doctrine.

There are, by contrast, no unsolvable problems in punishing the unintended battery of a chance or unintended victim. The common law penalty for common law battery is, after all,

unlimited and the defendant may receive any appropriate sentence without the necessity of transferring some subtle *mens rea* from the intended target to the unintended victim. The sentence can be adjusted upward or downward without any need for formal aggravation or mitigation. When the injury inflicted on the unintended victim, moreover, is at the non-fatal level of a battery, one does not need a transferred intent doctrine to establish basic criminal responsibility. That is proved directly without any resort to the legal fiction of transferred intent. Indeed, the majority opinion in *Ford v. State,* 330 Md. 682, 716 n. 14, 625 A.2d 984 (1993), noted that the non-application of the transferred intent doctrine to cases of inchoate criminal homicide does not create the punishment vacuum that might be present in cases of consummated criminal homicide:

> We note that refusal to apply transferred intent to attempted murder by no means relieves a defendant of criminal liability for the harm caused to unintended victims. The defendant clearly can be convicted of attempted murder as to the primary victim and some other crime, such as criminal battery, as to other victims.

In the case of unintended victims who are simply in harm's way and are not actually injured, the crime of reckless endangerment is also available to pick up much of the slack and to make resort to the transferred intent doctrine less compelling.

Although in *Harrod v. State,* 65 Md.App. 128, 499 A.2d 959 (1985), the Court of Special Appeals was only addressing the non-applicability of the transferred intent doctrine to those cases in which *no* actual physical harm was done to the unintended victim, the quotation with approval from Rollin Perkins had implications that were far more sweeping:

> By illustration, Professor Perkins explains the logic underlying the limited application of this doctrine:
>
>> If, without justification, excuse or mitigation D with intent to kill A fires a shot which misses A but unexpectedly inflicts a non-fatal injury upon B, D is guilty of an attempt to commit murder—but the attempt was to mur-

der A whom D was trying to kill and not B who was hit quite accidentally. And so far as the criminal law is concerned there is no transfer of this intent from one to the other so as to make D guilty of an attempt to murder B. Hence, an indictment or information charging an attempt to murder B, or (under statute) an assault with intent to murder B, will not support a conviction if the evidence shows that the injury to B was accidental and the only intent was to murder A.

65 Md.App. at 136, 499 A.2d 959.

At a very fundamental level, there is an argument, based on internal consistency, against using the transferred intent doctrine in cases of inchoate homicide. We are concerned, after all, with a single crime—assault with intent to murder (or its common law analogue of attempted murder). It would be randomly haphazard to say with respect to that single crime that the transferred intent doctrine sometimes applies and sometimes does not. If transferred intent will not be used (as it is not) to elevate a simple assault into an assault with intent to murder when the victim is not touched, it makes no sense to say that precisely the same crime will be elevated into an assault with intent to murder when the victim is touched. That would be to make a distinction, within the single crime of assault with intent to murder, between those instances when the assault is of the attempted-battery variety (no touching) and those instances when the assault is of the actual-battery variety (touching). Guilt of assault with intent to murder should not rise or fall on the immaterial happenstance of whether the victim is touched. The problem, after all, is one of *mens rea* and not of *actus reus*. In *Ford v. State*, 330 Md. 682, 715, 625 A.2d 984 (1993), Judge Chasanow noted that in cases involving the inchoate criminal homicides, the random factor of whether or not a physical injury occurred is immaterial:

A related reason why transferred intent cannot properly apply to attempted murder derives from the fact that the crime of attempted murder requires no physical injury to the victim. Although in *Wilson* the bystander was in fact

injured, injury is not an essential element of attempted murder.

There is one further argument based on logical *inconsistency*. If an assault with intent to murder misses its target and hits an unintended victim and the aggravating *mens rea* were then to be "transferred" so as to transform the otherwise simple battery of the unintended victim into a constructive assault with intent to murder, what are the limits of such logic? Suppose the assaultive force that misfired had instead been unleashed with the intent to rob the targeted victim; would the otherwise simple battery of the unintended victim thereby become a constructive assault with intent to rob? Suppose the assaultive force that misfired had been with the intent to rape the targeted victim; would the otherwise simple battery of the unintended victim thereby become a constructive assault with intent to rape? Could it be an assault with intent to rape, moreover, even if the unintended victim were a man? Why should one aggravating *mens rea* be transferable but others not? The use of an acknowledged fiction to manipulate specific intent, although necessary to establish guilt in the context of consummated criminal homicide, would degenerate into a carnival in the very different context of inchoate criminal homicide. There is, moreover, no reason to push the fiction beyond the limits of its necessary utility.

Consummated criminal homicide is, in the last analysis, *sui generis*. Many of its complexities, such as the transferred intent doctrine, simply do not travel well to other criminal climes. There is, moreover, no reason of necessity for making the transferred intent doctrine travel to climes other than that of actual, consummated criminal homicides. For the rest, the actuality of the real *mens rea* properly combined with its precisely related *actus reus* is enough to establish guilt at the appropriate level without any necessary resort to an intention-shifting legal fiction. The inchoate criminal homicides are in no need of such a device. Thus, we hold, the completed matrix looks like this:

| | Unintended Target Hit and Killed | Unintended Target Hit But Not Killed | Unintended Target Missed |
| --- | --- | --- | --- |
| Intended Target Missed | TRANSFERRED INTENT | NO TRANSFERRED INTENT | NO TRANSFERRED INTENT |
| Intended Target Hit But Not Killed | TRANSFERRED INTENT | NO TRANSFERRED INTENT | NO TRANSFERRED INTENT |
| Intended Target Hit and Killed | TRANSFERRED INTENT | NO TRANSFERRED INTENT | NO TRANSFERRED INTENT |

## Reducing To The Lowest Common Denominator

The full matrix, although helpful perhaps to illustrate the evolutionary development of the transferred intent doctrine, is, in the last analysis, unnecessarily redundant. For more efficient reference, it is well-advised to reduce the doctrine's applicability to its lowest common denominator:

| Unintended Target Killed | Unintended Target Not Killed |
| --- | --- |
| TRANSFERRED INTENT | NO TRANSFERRED INTENT |

In a nutshell:

THE FATE OF THE INTENDED TARGET IS IMMATERIAL. IF THE UNINTENDED VICTIM IS KILLED, THE TRANSFERRED INTENT DOCTRINE APPLIES. IF THE UNINTENDED VICTIM IS NOT KILLED, THE TRANSFERRED INTENT DOCTRINE DOES NOT APPLY.

## The Jury Instruction In This Case

The unintended victim, Tiffany Evans, was not killed. It was, therefore, error to have instructed the jury on the subject of transferred intent. The error was obviously prejudicial in that the State was thereby erroneously relieved of its obligation, on the charge of assault with intent to murder, to prove the required *mens rea* of a specific intent to kill Tiffany

Evans. The conviction for assault with intent to murder must be reversed.

### The Reckless Endangerment

The erroneously given instruction on transferred intent, on the other hand, had no effect on the reckless endangerment conviction and the appellant, indeed, makes no claim in that regard. The appellant's contention that the reckless endangerment conviction should have merged into the assault with intent to murder conviction is rendered moot by our reversal of that assault with intent to murder conviction. The reckless endangerment conviction now stands alone, with nothing into which it could merge.

### Legal Sufficiency of the Evidence

The appellant finally contends that the evidence was not legally sufficient to support her conviction for assault with intent to murder. Although for immediate purposes of this appeal, our reversal of that conviction on other grounds would seem to render unnecessary the consideration of any alternative claim of reversible error, the alternative claim could become "unmoot" at some future time *if* two contingencies come to pass. *If* 1) the State should attempt to retry the appellant for the assault with intent to murder Tiffany Evans *and if* 2) the appellant should think to interpose a double jeopardy plea in bar, our *present* resolution of the legal sufficiency claim might *then* take on dispositive significance. Because of that possibility, it behooves us to consider the claim.

Although we agree with the appellant that there was no legally sufficient evidence to show that she harbored any individualized or particularized specific intent to kill that was directed toward Tiffany Evans as a target deliberately selected for harm, there nonetheless could have been on her part, under the theory of concurrent intent developed in *Ford v. State,* 330 Md. 682, 716–18, 625 A.2d 984 (1993), a specific intent to kill anyone and everyone in the "kill zone" closely surrounding the intended target. The evidence was sufficient

to permit a finding that Tiffany Evans was in that "kill zone." What was unleashed toward the crowd, moreover, was not a single, well-aimed bullet but a fusillade of no less than five shots that sprayed the area. Under the circumstances, just as the evidence could have permitted a finding that the actual triggerman, the principal in the first degree, intended to kill anyone in his field of fire, it also could have permitted the finding that the appellant, as the aider and abetter of the triggerman, independently harbored such an intent. Under this theory, the evidence was sufficient to sustain the conviction for assault with intent to murder.

*CONVICTION FOR ASSAULT WITH INTENT TO MURDER REVERSED AND CASE REMANDED FOR POSSIBLE FURTHER PROCEEDINGS; CONVICTION FOR RECKLESS ENDANGERMENT AFFIRMED; COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.*